By the Court. Bosworth, J.
On the 12th of Nov., 1847, the Pelican Mutual Insurance Company borrowed of 0. & Gr. Belden $2,500. No time was fixed by the terms of the loan when the money was to be repaid. The company gave a memorandum check for the sum borrowed, signed by their president, payable to the order of and endorsed by their secretary, and at the same time delivered to the Beldens as collateral security for the return of the money three promissory notes belonging to the company, and being part of their property and effects.
*122 On the 6th of December the defendants loaned to the company $1,000, and on the 7th of December the further sum of $1,000, and on one of those days received from the company a§ collateral security for the repayment of the loans, promissory notes, being of the property and effects of the company, and amounting to between $4,000 and $5,000. The moneys thus borrowed of the defendants and the Beldens were properly applied to the use of the company in the transaction of their ordinary business. - The notes turned out as collateral were • taí¡en in the regular course of the company’s business, for premiums, for risks on various vessels.
On and prior to the 14th of December, 1847, the company owed the defendants $3,010, for a loss, under a policy of insurance, effected hy the defendants on the brig George, in March, 1846.
On the 14th of December, the defendants discounted for the company all of the collaterals which were held by themselves and the Beldens, and retained pursuant to the terms óf the arrangement under which the discount was made.
Their loan of - -' - - - - $2,000
The amount of loss of brig George - - 3,010
Eor discount on the notes and interest on the
money lent ^..... 649 31
And paid to the Beldens for the company their
loan of ------ 2,500
And for interest on their loan - - - 120
And to the company the balance of the proceeds, being..... 113 98
These notes were discounted by the defendants at the rate of seven per cent.
There was no resolution of the trustees formally authorizing the transfer of the collaterals to either the Beldens or the defendants, or the transfer of them to the defendants at the time the latter discounted them.
The company continued to transact business and take risks until the 28th of January, 1848.
On the 3d of January, 1848, creditors of the company pre *123 seated to the Supreme Court a petition, which set forth the insolvency of the company, their inability to pay their debts, and prayed for an order or judgment dissolving the company, and for the appointment of a receiver, and for an injunction.
On the 18th of February, 1848, the Supreme Court decreed the dissolution of the company^ granted an injunction, and ordered the appointment of a receiver. The plaintiff was appointed such receiver on the 14th of March, 1848.
The plaintiff brings this action to avoid -the transfers of the notes discounted by the defendants on the 14th of December, 1847, and to compel them to account for the moneys they have collected upon any of these notes with interest, and to pay the value of such of them as may remain in their hands uncollected.
The plaintiff’s counsel insisted that the transfer to the defendants on the 14th December, 1847, of the notes in question, amounting to $8,393 was void on two grounds:
1. Because the transfer was not authorized by a previous resolution of the board of directors.
2. Because (as he insisted the fact was), the company at the time of the transfer was actually insolvent, or made it in contemplation of insolvency, and with the intent of giving a preference to the defendants over other creditors.
He also insisted that there was, at least, sufficient evidence to call for the submission to the jury of the question, whether the company was not in fact insolvent, and whether the defendants did not Imow of the fact, or have such notice as made it their duty to inquire how that fact was. He also objected that proper evidence to be submitted to the jury was excluded by the court. The Chief Justice before whom the cause was tried, decided that on the evidence given, the plaintiff could not recover, unless he proved, that at the time of the transfer the company was either openly and avowedly insolvent, or actually insolvent, and that the defendants had knowledge of it.
When the plaintiff rested, the Chief Justice, on the motion of defendants’ counsel, dismissed the complaint, on the ground that there was no evidence of open or distinct insolvency, nor sufficient . evidence of a knowledge by the defendants of actual insolvency, to entitle the plaintiff to have that question of fact *124 submitted to the jury. The plaintiff excepted, and the only questions presented for review, relate merely to the accuracy of the decisions made at the trial.
It appeared very clearly from the evidence, that it was part of the ordinary and accustomed business of the president to adjust and pay losses. One of the by-laws (the third) of the company gives authority to the president, vice-president, or either of them, “ to sign the policies of the company, and transact its ordinary business.”
The ninth by-law gives them “ authority to settle and pay all claims for losses and return premiums in full, or by compromise, except such claims as in their judgment may be deemed of a doubtful character, in which case the same shall be ■referred to the committee of advice, 0and settled'or adjusted as the committee may determine.”
In 1845-6 the company occasionally paid losses in notes. These notes being payable one year from date, it was difficult to get them discounted by the banks, and sometimes money was borrowed to pay losses. The president transacted the business of adjusting and paying the losses. This course of business was not only well known °to the trustees, but it was expressly provided by the by-laws that the president might transact this business and all the ordinary concerns of the company.
I think this mode of dealing and transacting the business of the company is clearly authorized by its charter. The fourth section declares that “it shall possess all the powers and privileges, and be subject to all the restrictions, reservations, and limitations, which are reserved, granted, or imposed upon the Atlantic Mutual Insurance Company by the act incorporating that company,” with two exceptions, which have no bearing upon any point controverted in this action. (Laws of 1843, p. 66, §4.)
The act incorporating the Atlantic Mutual Insurance Company, provides that “ all the corporate powers of the said company shall be exercised by a board of trustees, and such officers, clerks, and agents, and other persons as said trustees may appoint from time to time.” ’ (Laws of 1842, p. 262, § 3.) It authorizes the trustees “ to make such other by-laws as may be deemed *125 necessary for the government of the officers and the conduct of their affairs. (Id. § 5.) That the company, for the better security of its dealers, may receive notes for premiums in advance, of persons intending to receive its policies, and may negotiate such notes for the purpose of paying claims, or otherwise, in the course of its business.” (Id. § 12.)
The company is expressly authorized by its charter to negotiate notes for the purpose of paying losses : so far as the transaction of the 14th of December, 1847, was a negotiation of its notes to pay losses under the policy of insurance on the brig George, its legality is found in the charter of the company, and is valid, unless it was of such a character as to subject it to the .operation, of the prohibitory provisions of the 8th or 9th section of the 1st of E. S. p. 591.
It certainly cannot be of the least consequence whether they are negotiated directly to the person to whom the loss is payable, or to some third person who is willing to discount them, and thus enable the company to pay the loss in money.
The act is explicit that they may not only be negotiated for the purpose of paying claims, not losses merely, but claims, or “ otherwise, in the course of its business.”
The negotiation of notes to the Beldens on the 12th of Kovember, and to the defendants on the 6th and 7th of December, as security for money borrowed of them, was a transaction in the course of its ordinary business. The money was borrowed for the use of the company, was applied to its legitimate business, and for aught that appears in paying losses. Those who loaned the money had a just claim against the company for its repayment ; the company was authorized by its charter to negotiate its notes for the purpose of paying these claims. It did so negotiate them on the 14th of December, 1847, to the defendants, who retained sufficient of the proceeds to satisfy, and in payment of the amount due them, and paid for the company to the Beldens and'to the company the residue of the proceeds, in cash, amounting to the sum of $2,733TW
The transaction was clearly a proper one, unless it can be avoided on the ground that it falls within some one of the prohibitions contained in the 8th or 9th section of 1 E. S. p. 591. *126 I think it does not come within any prohibition contained in the 8th section.
That section allows the issuing of notes or other-evidences of debt by the officers of a company in the transaction of its ordinary business, amounting to more than $1000 ai a time. It was insisted that the issuing of notes or other evidences of debt, as here used, means. obligations or promises to pay, made by the company itself, and not notes owned by it and made by third persons. If this be so, it is not obvious that this section can have any full practical application to incorporations of the nature of this one. Ordinarily it could not well have any notes or evidences of debt to issue except those made by its dealers. The Revised Statutes declare that “ the term, evidences of debt,” as used in this title, shall be construed to embrace every written instrument or security, for the payment of money, importing on its face the existence of a debt, and whether under seal or otherwise.” (1 R. -S. 599, § 65.) The statute therefore makes it include evidences of debts, other than of the debts of the company itself. Reither is it obvious if this claimed construction be correct, why the transfer by a bank of $1000 at a time, of bills made by other banks, on discounting a note, is not as much prohibited by § 8, as a transfer by this company of its premium notes in payment of a claim or on a sale of them for cash.
This transaction was, in effect as wfell as in form, either a sale of the notes upon a discount of them by the defendants, or a negotiation of them in payment of claims. Either disposition of them is expressly authorized by § 12 of the act of 1842. (Laws of 1842, p. 263.)
The president could lawfully be authorized to transact such business. The uniform usage of the company in transacting it through Trim, coupled with the powers conferred by the by-laws, constituted him a fully authorized agent for that purpose, and his lon&fide transactions with its dealers bind the company and the plaintiff. (Howland v. Myer, 3 Coms. 290; Hyde v. Lynde, 4 Coms. 387.) I do not think that a previous resolution of the company is necessary to authorize each or any particular transfer by an incorporation of over one thousand dollars of its *127 effects, where the transfer is made in and according to the ordinary course of its business, and to pay just claims. (2 Sandford S. C. R. 180 ; Aspinwall v. Myer, S. C. 3 Coms. 290.)
I think that the complaint was properly dismissed, and that the plaintiff could not recover on proving less than was required of him at the time. If he could have proved that the company was openly and notoriously insolvent on the 14th of December, 1847, or that it was actually insolvent, and that the defendants had knowledge of the fact, then the discount of the notes might have been regarded as a transaction,'in effect, designed to secure payment to the defendants of the loss that had been incurred by the company under its insurance of the brig George, and to prefer them to that extent over other creditors. The only words in the 9th section which could, even in that aspect, be regarded as descriptive of this transaction are, “no transfer, nor any payment made, by any such corporation when insolvent, or in contemplation of insolvency, with the intent of giving a preference to any particular creditor over other creditors of the company, shall be valid in law.” There certainly was no judgment suffered, lien created, or security given. There was a transfer of some notes which the Beldens held as security for money loaned. The other notes were held by the defendants at the time, as security for moneys previously loaned by them. The notes held by each amounted to more than their loans, and could be lawfully retained until the loans were repaid. The transfers made at the time of the loans were not made with intent of giving a preference, or to secure any pre-existing debt. Money was then borrowed temporarily on the security of the transferred notes. It was certainly lawful to repay the loans out of the proceeds of such notes. It was lawful for the defendants, at the instance of the company, to discount at the rate of seven per cent, the notes held by the Beldens, and pay the latter the amount of their loan and interest. There was nothing as to which the defendants could be preferred, or which the company could have then had an intent to prefer, unless it was the debt for the loss of the brig George. Unless such facts could be proved as would clearly show that the purpose of the defendants in discounting the notes on the 14th of December was to obtain payment of'that debt from a company insolvent, *128 and known to be so, there could be no ground for saying that the transaction was a payment made by an insolvent company with' intent to prefer one of its creditors over another. If the transfer or the payment, whatever it may be called, was not made with that intent, then it is not prohibited by the ninth section.
It cannot be successfully pretended, that if a company of this character which does not intend to suspend operations, or believe that it must necessarily fail, and continues its business, believing it will sustain itself by means, which it confidently expects to be able to command, but which it ultimately fails to get; cannot make valid payments to its bond fide dealers, while in this condition, although the result may show, that in point of fact its me^ns were insufficient when these payments were made to satisfy its creditors in full.
The condition of these defendants, on the 14th of December, 1847, was this : They held $3,500 (in amount) 'of notes of the company, as security, for a loan of $2,000, made on their credit. The company owed them another debt of $3,010, conk-acted in the regular course of its business. They received from the company, notes amounting, with those they held, to $8,393,S,§: they took these notes in satisfaction of the loan of $2,000, and of the interest due, on account of their debt of $3,010, and actually advanced in cash $27385,8.
Unless all this was done merely to prefer them, as to the debt of $3,010, over other creditors, and with that intent, why should they not retain the notes ? And how can the intent thus to prefer them exist, or be established, unless it be true that the company making the transfer was, in fact, insolvent, and the defendants had knowledge of that fact. Unless they knew of such insolvency, or believed it to exist, the. idea of obtaining a preference by the transaction, or the possibility of that being an inducement to it, would be out of the question.
What the actual condition of the company then was, is not precisely shown. There was evidence enough, I think, to justify the submission of the question, of its being, in fact, unable to pay all its debts, but not to justify a jury in finding, that the defendants knew or believed that to be the fact. The evidence showed that the defendants advanced their subscrip *129 tion note to the company in August, 1847, for $3,000, and discounted it for the company in October or November, 1847. That the company yet owes them at least $2,000, on this note. If they were favorite creditors whom the company intended to prefer, or who sought payment by way of preference through the transaction of December, 1847,- it is singular that no attempt was made to obtain payment of the amount owing to them by the company. There was no evidence that the defendants at any time apphed to' any officer of the company for payment or security, or conversed with them or with any one else relative to the particular condition of the affairs of the company, or knew or heard that dealers who applied for payment of liquidated or conceded losses were refused payment; or delayed in receiving it. The company continued to pay losses until the first of January, 1848. The secretary testified that on the 28th of December the company paid losses to the amount of $9,000, and that it had then a surplus of assets. If the company was actually insolvent, there was no evidence tending to show that the defendants knew that fact.
Without such evidence the transaction of the 14th of December, between the defendants and the company was, as between them, one that occurred in and according to its ordinary course of business, in which a loss owing was paid by the company, and the defendants discharged a just claim and bond fide advanced money to the company.
That the intent to prefer one creditor of an insolvent company to another, is essential to render a transfer by such a company invalid, is illustrated by § 71, of the article in relation to the voluntary dissolution of corporations. (2 R. S. 469, § 71.) That section declares all transfers made, after the filing of a petition for dissolution, in payment of, or as security for a preexisting debt, or for any consideration, void as against the receivers who may be appointed, and as against the creditors of the corporation, irrespective of the intent with which the transfer is made. That provision applies as well to the case where a petition for a dissolution is presented by the directors, trustees, or other officers of a corporation, as by its creditors* (2 R. S. 463, § 39, 40, and 41 and 42 ; and id. 467, § 58, 65, 67> 68, 70, and 71.)
*130 § 9 of 1 R. S. 591, declares transfers by an insolvent company invalid when made with intent to pay or secure one creditor, in preference to another. It was not intended to invalidate a fair bond fide transaction between itself and one of its dealers, who, without notice of its actual insolvency, discounted its notes according to its ordinary course of business, although as part and parcel of the transaction he was paid, and cancelled a just claim.
The defendants’ counsel, referring to the 9th of December, 1847, asked a witness this question: “ What was the credit of the company at that time?” Upon objection, the question was excluded, and an exception taken to the opinion of the court: This decision, taken in connexion with the further decision that the plaintiffs might show open and notorious insolvency, or actual insolvency and knowledge of it by the defendants, must be regarded as conclusive on this motion, that the question was not put for the purpose of proving that the company was then generally reputed to be insolvent: that course of inquiry was expressly permitted to the plaintiff’s counsel by the court; the question, upon all fair intendment, must be deemed to have been put with a view to ascertain rather the relative standing of the company, as to the extent of its business, the general character of its risks, -and the amount of its capital, or other points entirely compatible with the absence of all suspicion of insolvency, than its general reputation for actual solvency or insolvency: I think the question as put was properly excluded.
It requires a somewhat strained construction, in- which every inference and intendment must be taken unfavorably against the defendants, to hold that the loan by the Beldens was usurious. Whatever the contract was, the defendants were not parties to it. They do not claim under it, nor do their rights depend upon it. If the company, in the ordinary course of its business, deemed it for its own interests to pay a usurious rate of. interest, I do not see that after having paid it they had any rights left, except to bring an action within one year thereafter, to recover back the usurious excess from the person receiving it. (1 R. S. p. m, § 3.)
The defendants did not receive this excess. They advanced *131 the $2,620 for the company to the Beldens, and it does not even appear that they knew any part of the advance was to compensate the Beldens at a greater rate than 7 per cent, for the loan of money. There is nothing in the evidence upon this point establishing any right to have the transaction of the 14th of December avoided on the ground that the loan by the Beldens on the 12th of Eovember was usurious.
This case has been considered upon the assumption that the provisions of the 8th and 9th sections of 1 R. S. p. 591 are applicable to this company, so far as they do not conflict with the terms of this charter. Whether they are or are not applicable, it is unnecessary to decide. If applicable to that extent, they do not invalidate the transaction of December 14th, if the view that has been taken of it be correct. i
The first and second articles of that title treat of corporations whose powers, by the terms of their charter, are to be exercised by a board of directors. Section 63 of the third article of that title declares that the term directors, as used in that title, shall be construed to mean all persons having by law the direction or management of the affairs of any such corporation, by whatever name they may be described in its charter, or known in law. (1 R. S. p. 599, § 33.)
Bronson, Ch., in Gillett v. Campbell, expressed the opinion that sections 8 and 9 only extend to such moneyed corporations as are by their charters subject to the management of a board of directors, trustees, or other officers. (1 Denio, 523.)
That they did not extend to corporations whose powers, instead of being made by their charters exercisable by a board of trustees, might be vested at the will of the corporation in a single agent or officer.
It is unnecessary, on the facts appearing and evidence given in this case, to decide that question, and no opinion is intended to be expressed upon it. We are of the opinion that no error was committed by the judge at the trial, and that a judgment should be entered in favor of the defendants.