The first question which I propose to examine, is the one embraced in the proposition of the receiver: that the million and the first half million trust deeds, and the assignments of bonds and mortgages connected therewith, are void because not authorized by a previous resolution. The examination of this question necessarily involves the consideration of the question, whether the provisions of the title of the Revised Statutes, in relation to moneyed corporations, are applicable to banking associations organized under the general banking law. If this latter question was res integra, I should have very little difficulty in disposing of it. The act authorizing the business of banking contains intrinsic evidence that the legislature which passed it did not intend to authorize the creation of moneyed corporations. The word corporation is not to be found in any part of the act. The provisions inserted in every bank charter since 1828, conferring the general powers of a corporation, as defined in the Revised Statutes, are studiously omitted. The act also omits to confer, in express terms, in accordance with legislative usage, prior to the adoption of the Revised Statutes, the power to make and use a common seal, to adopt a corporate name by which to sue and be sued, and to grant and receive property, and to make by-laws for the government of the association; three of the ordinary incidents of a corporation. (Laws of 1823, § 16; 2Kent's Com., 278.) There is also convincing evidence in the circumstances under which the system of free banking was proposed and adopted by the legislature, independent *Page 183 
of the internal evidence of the act to authorize it, that the legislature intended to authorize only the creation of banking partnerships or unincorporated joint-stock companies. I am not aware that any doubt has been expressed, in any one of the numerous cases which have been before our courts, involving the question whether our banking associations were corporations or partnerships, that the legislature intended they should be partnerships merely. (1 Hill, 616, 623; 7 Hill, 506.) But it is insisted, and it has been so decided, not only by the late Supreme Court and the Court of Errors, but also by this court, that, notwithstanding the intent of the legislature to the contrary, banking associations, organized under the act to authorize the business of banking, are corporations, and corporations to all intents and purposes. (Thomas v. Dakin,
22 Wend., 9, 69-74; Warner v. Beers, 23 Wend., 103, 190;People v. Supervisors of Niagara, 4 Hill, 20; S.C., 7Hill, 504, in error; 1 Hill, 616, 620; Livingston v.Gifford, 2 Denio, 380, 394; Talmage v. Pell, 9 Paige,
415; Gillet v. Moody, 3 Comst., 485; Talmage v. Pell, 3Seld., 340.) These decisions are based upon the ground that the conferring upon these associations the corporate attributes of a succession of the members, without changing the identity of the body, of the transferability of the shares of the association, and of the exemption of the shareholders from personal liability for the debts of the association, necessarily made such associations corporations. The reasons assigned for these determinations was that it was not within the power of the legislature to give to these associations the essential attributes of a corporate body, without creating them corporations; that "human powers are not equal to the task of changing a thing by merely changing its name," per BRONSON, J. Without pausing to inquire whether these decisions are warranted by the principles of law and sound logic, and whether the legislature, in the exercise of its approximately unlimited legislative power, cannot, if it so wills, confer upon a partnership *Page 184 
a portion of the ordinary attributes of a corporation, without converting such partnership into a corporation, it is sufficient for the present purpose to say that the principle of staredecisis stands in the way of a reagitation of the questions embraced in these decisions. Before dismissing this topic, it is proper to remark that the British Parliament has asserted its competency, by the enactment of various statutes, to confer upon joint-stock companies certain of the powers and privileges of a corporation, without creating them corporations. The act of 1Victoria, ch. 75, authorizing the queen to confer upon joint-stock companies many of the ordinary attributes of a corporation, without destroying their character as partnerships, resembles, in many essential particulars, the act to authorize the business of banking. (Smith's Mer. Law, 57-72; 2 LawLib., 5th series, 68-77.)
But, conceding the necessity of defeating the legislative intent, to authorize the formation of banking associations without imparting to them a corporate character, there certainly was no necessity for defeating the intent of the legislature, that the statutes of the state previously enacted, which related specially to moneyed corporations with banking powers, organized under the then existing system, should not apply to such associations. If the legislature intended that these associations should be partnerships merely, and not moneyed corporations, it needs no argument to show that it could not have intended that such associations should be subject to such statutes. An intent that these associations should not be moneyed corporations, necessarily embraces an intent that they should not be subject to statutes which related specially to such corporations. Besides, the act to authorize the business of banking contains internal evidence that the legislature neither contemplated or intended that such associations should be subject to the general statutes applicable to the then existing moneyed corporations. It provides (§ 27) that these *Page 185 
associations may be proceeded against for any violation of the provisions of the act to authorize the business of banking, and be dissolved by the court of chancery in the same manner as any moneyed corporation may be proceeded against and dissolved; thereby clearly indicating the understanding of the legislature, that the provisions on that subject, in the safety fund act and in the Revised Statutes, would not be, and an intent that they should not be, applicable to these associations. (2 R.S., 464, § 39, 1st ed.)
The act to authorize the business of banking, also provides (§ 28) that if any portion of the capital of the association shall be withdrawn, whilst any debts remain unsatisfied, no dividends shall be made until the deficit of capital shall be made good. This provision is inconsistent with the provisions of the Revised Statutes, in relation to withdrawing the capital of moneyed corporations, and the prohibition of dividends in case of a reduction of capital by losses, and shows that an entirely new system of banking was intended to be inaugurated, to which the provisions of the Revised Statutes relating to the old system would not be applicable. (1 R.S., 589.) The several acts of the legislature, passed subsequently to the act to authorize the business of banking, applying specially to banking associations provisions in previous statutes relating to moneyed corporations, especially the act of May 14, 1840, are a legislative construction of the general banking law, and are emphatic legislative declarations that banking associations were not subject to the general statutes above mentioned. It is a rule of construction of statutes, that such a construction should be put upon them as will best effectuate the intent of the makers. In my judgment, the provisions of the act to authorize the business of banking, in connection with the proceedings of the legislature attending its introduction into and passage through its two houses, clearly show an intent, on the part of the legislature, that the *Page 186 
associations to be formed under such act should not be subject to the general statutes above mentioned.
There is a distinction between the statutes, exclusively applicable to moneyed corporations, and the general laws of the state, written and unwritten, applicable to all corporations. It may very well be that the determination that these associations are corporations, may necessarily subject them to such general statutes as are applicable to all corporations, as they undoubtedly are to the rules of the common law in respect to corporations in general; but from these concessions, it by no means follows that the statutes exclusively applicable to a particular class of corporations, must be applicable to these associations, in opposition to the intent of the legislature. There is no necessity for this application. These associations may be corporations without being placed in that particular class of corporations designated in the Revised Statutes as moneyed corporations.
If I am right in this conclusion, the title of the Revised Statutes in relation to moneyed corporations, is not applicable to these banking associations. But although I entertain no doubt in respect to the soundness of this conclusion, I apprehend that we cannot give effect to it in this case, in consequence of several decisions of this court the other way. In Gillett v.Moody (3 Comst., 479), where the directors of the St. Lawrence bank (a banking association), after such bank had stopped payment, purchased of the defendant, a director, his stock in the bank, and paid him for the same an equal amount in Arkansas bonds, it was held by this court, Judge BRONSON delivering the opinion of the court, that the act was forbidden by the second and fifth subdivisions of the first section of the title of the Revised Statutes, in relation to moneyed corporations, which prohibit the directors from dividing, withdrawing or paying to the stockholders any part of the capital stock of the corporation, c., and the application of the funds of the corporation, except surplus profits, to the purchase of *Page 187 
shares of its own stock; and it was also held in that case, that as banking associations were moneyed corporations, to all intents and purposes, that that title of the Revised Statutes applied to such associations.
In Talmage v. Pell (3 Seld., 328, 340), Judge GARDINER expresses the opinion that banking associations, as banking corporations, were subject to all the general laws relating to that class of corporations, except so far as those general laws have been modified or superseded by the general banking law; and he says this proposition is the necessary result of the decision in the Supervisors of Niagara v. The People (7 Hill, 504), and Gillet v. Moody, in this court. Judge GARDINER proceeds and says, p. 341: "If banking associations are subject to taxation, and to the act to prevent the insolvency of moneyed corporations, as settled by the adjudications, no reason is perceived why they are not bound by all general laws relating to moneyed corporations not in conflict with the one under which they were created."
In Gillett v. Philips (3 Ker., 116), where the St. Lawrence Bank, a banking association, in December, 1841, stopped specie payments, and was then insolvent, and afterwards, in April, 1842, the cashier sold to the defendant, a stockholder in and a director of the bank, three promissory notes owned by the bank, amounting to $2016, for $1200, for the purpose of raising funds to redeem the circulating notes of the bank, it was decided by this court, GARDINER, C.J., delivering the opinion of the court, that the sale of the notes was void, being made in violation of the eighth section of the title of the Revised Statutes in relation to moneyed corporations.
We are asked by the counsel for the respondents not to regard these decisions as authority, for the reason that the point, of the applicability of the title of the Revised Statutes, in relation to the moneyed corporations, to banking associations, did not arise in the case of Talmage v. Pell, *Page 188 
and that it was passed upon by the court without being discussed by the counsel in the cases of Gillett v. Moody, and ofGillett v. Philips, and, therefore, that it is evident it could not have been fully considered by the court in those cases. In Gillett v. Philips, Judge GARDINER says not a word upon the point in his opinion. He assumes, as a matter not in dispute, that the title applies; and the point seems, in like manner, to have been assumed in Gillett v. Moody, by Judge BRONSON, without much examination; as is apparent from his placing his decision, in part, upon a violation of the second subdivision of the first section of the title in relation to moneyed corporations, which was clearly superseded by the twenty-eighth section of the act to authorize the business of banking.
It is quite clear that this question has never been fully considered by this court; but inasmuch as it has been expressly determined by the court in two cases, I do not feel at liberty to disregard the determination, although I believe it to be erroneous, for I do not think that the correction of the error will compensate for the mischief of shaking the stability of the decisions of the court. "It is essential to the security of property that a rule should be adhered to when settled, whatever doubt there may be as to the grounds on which it originally stood." (Per SIR WM. GRANT, 18 Ves., 110.)
If the title of the Revised Statutes in relation to moneyed corporations is to be deemed to apply to banking associations, the next question to be considered is, whether the million and the first half million trust deeds, and the accompanying assignments of bonds and mortgages, were authorized by a previous resolution of the board of directors. The only previous resolution of the board of directors, in relation to the million trust, previous to the execution of the final million trust deed and of the accompanying assignments, was that of the 6th January, 1840. That resolution furnished no authority for executing the trust deed and *Page 189 
assignments in question. It authorized an assignment of bonds and mortgages only to the amount of $1,000,000, and to Beers, Tylee and Graham, as trustees; while the assignments in question were made to Blatchford, Curtis and Graham, as trustees, and were of securities amounting to $1,200,000. These latter assignments cannot be regarded as authorized by the resolution, as they did not conform to it. The North American Trust and Banking Company, under the decisions, must be regarded as a statute corporation, and its powers of alienation, as such, were limited and regulated by statute. It is a familiar rule, that a statute power must be strictly pursued, and must be pursued in the mode and form prescribed by the act creating it, or by the act which regulates its exercise. (8 Barb., 133, 149; 1 Story Eq. Jur., § 96; 1Hill, 114, 115; 3 Comst., 396; 2 Cow. Hill, 1288, 1289; 4 Wheat., 77; 3 John. Cas., 107; 7 Cow., 88, 462; 7Paige, 83, 84; 2 Seld., 92.)
The eighth section of the title in relation to moneyed corporations inhibits the assignment by such corporations of any of their effects, exceeding the value of $1,000, unless authorized by a previous resolution of the board of directors. This statutory provision limited the jus disponendi of these corporations, and should have been strictly pursued by the directors of the North American Trust and Banking Company. The previous resolution adopted by its board of directors should, at least, have specified the names of the trustees and the amount of the securities to be assigned. There was no previous resolution of the board of directors, of any kind, authorizing the execution of the first half million trust deed and its accompanying assignments.
The want of original authority, to execute the million and the first half million trust deeds and accompany assignments, could not be supplied by a subsequent ratification, because the statute peremptorily calls for a previous resolution, and the statute is to be strictly pursued. Even in the case of conventional powers, where the nature and *Page 190 
object of the power, and the circumstances of the case point to a previous consent, there such previous consent is necessary, and the execution of the power cannot be ratified by a subsequent consent. (Greenham v. Gibbeson, 10 Bing., 363, per
TINDAL, C.J., Eng. Com. Pleas.) But as the board of directors did not itself exercise a delegated authority, it undoubtedly had power to delegate, to a committee of its own members, authority to adopt the resolution required by the statute, and to cause the assignments of the securities mentioned therein to be executed and delivered. The cases in 2 Metc., 166, and in 3 Comst.,
293, and the decision of the late chancellor in the Farmers'Loan and Trust Company v. Blake, not reported, sustain this proposition. It was held in Burrill v. Nahant Bank (2Metc., 166), that a board of directors of a bank in Massachusetts, not exercising a delegated authority, and constituting, for all purposes of dealing with others, the corporation, could delegate an authority to a committee of their own members to alienate or mortgage the real estate of the bank; and it was held in this court, in Howland v. Myer (3Comst., 290), that the president of the Alliance Mutual Insurance Company, chartered in 1843 (a moneyed corporation), under a by-law of the company empowering him to make contracts and transact all the ordinary business of the company, could transfer a note exceeding the value of $1,000, without a previous resolution of the board of directors.
The cases referred to by the receiver's counsel, on this point, relate to the construction of statutes granting statute powers, and to the subdelegation of judicial powers conferred by statute, and of a delegated private authority, involving personal trust and confidence. (3 Comst., 396; 2 Seld., 92; 26 Wend., 485; 16 Vesey, 27.) I, however, entertain doubts whether the articles of association, and the by-laws, of the North American Trust and Banking Company, did delegate authority to its committee of investment and finance, to pass the resolution of the date of 20th April, *Page 191 
1840, authorizing the assignments accompanying the million trust deed, and the resolution of the 30th April, 1840, authorizing the assignments accompanying the first half million trust deed. The superior court of the city of New-York, in Palmer v. Yates (3Sandf. S.C.R., 137), however, came to the conclusion that the by-laws of the company did delegate this authority to the committee of finance, and that the resolutions adopted by that committee must be deemed the resolutions of the board of directors; and the Supreme Court for the first district, inLeavitt v. Blatchford, came to a like conclusion. (5 Barb.,
27.)
The remaining question under this branch of the case is, whether the holders of the mortgage bonds, issued under the two trusts, are purchasers for a valuable consideration without notice, within the meaning of the saving clause of the eighth section, before mentioned.
[The learned judge here states the disposition made of the several bonds, and proceeds.]
The receiver insists that the saving clause of the eighth section, does not apply to a party who takes the transfer directly from the corporation; that the previous resolution is part and parcel of his title; that he is chargeable with knowledge of the law, and is bound to see that the officers of the corporation are authorized to make the transfer; that the trustees were not purchasers for value; and that they purchased with notice that there had been no previous resolution.
Neither the letter nor spirit of the saving clause, in my judgment, authorizes the construction that it does not apply to the party who takes directly from the corporation. The language of the clause is, that the section "shall not be construed to render void any conveyance, c., in the hands of a purchaser, for a valuable consideration and without notice." By these terms any purchaser, whether immediate or remote, from the corporation, is protected if he purchases for a valuable consideration, and without *Page 192 
notice of the omission to adopt a previous resolution; and such has been the construction given to the section by this court. InHowland v. Myer (3 Comst., 290, supra), it was decided that the plaintiffs, who took the transfer of a note for a sum exceeding $1000, directly from the corporation, without notice that no previous resolution of the board of directors had been adopted, authorizing the transfer, were bona fide holders of the note, for a valuable consideration without notice, within the meaning of the saving clause of said eighth section. If the purchaser of the property of a moneyed corporation, is to be chargeable with knowledge of the law requiring a previous resolution to authorize the sale, and in all cases where no resolution has been passed with notice of such omission, then the saving clause of the eighth section is a dead letter, and may be regarded as stricken from the statute. No such proposition can, upon any sound principle, be maintained. We are bound to give effect to the statute. That declares that no conveyance, c., made by the corporation, c., shall be void, when "in the hands of a purchaser for a valuable consideration and without notice." If the purchaser shows that he paid value for the property, and if there is no proof that he had any notice of the omission of the directors to pass a previous resolution, his conveyance will not be invalid. He can repose upon affirmative proof of a valuable consideration, and the want of proof of notice. The obligation rests upon the party assailing his conveyance, to prove affirmatively that he had actual notice, or what is equivalent thereto, that there had been no previous resolution to authorize the execution of the conveyance. This notice should be, at least, as clear and certain as that which is necessary to break in upon the registry acts. (4 Kent's Com., 171, 172; 2John. Ch. R., 182; S.C., 15 John., 569, and cases cited inFox v. Burch., 6 Barb., 78.)
In this case there is no evidence that the English bondholders had either any knowledge of the title of the Revised *Page 193 
Statutes in relation to moneyed corporations, or any notice, either direct and positive or implied, of the statutory requirement of a previous resolution authorizing the execution of the assignments in question as security for the payment of the mortgage bonds, or of the neglect of the directors to pass such a resolution, or even of a notice sufficient to put them on inquiry; and the inference from the testimony is irresistible, that the English bondholders received the bonds as purchasers, or pledgees, or mortgagees, in good faith, without any notice of any defect in the authority of the officers of the North American Trust and Banking Company to make and sell such mortgage bonds, and to execute the assignments as collateral security for their payment. If the question had been one only of the statutory power of the officers of the company to execute the bonds and accompanying assignments, and there had been no saving clause in favor of bona fide purchasers, the bondholders would have purchased at their peril, and would have acquired no title to or interest in the bonds and mortgages assigned, unless the statute in relation to the execution of the assignments had been strictly pursued; and in that case the previous resolution would have been part and parcel of their title. But the saving clause alters this rule of law, and furnishes a protection to them, if they are shown to be purchasers for a valuable consideration without notice. Under the operation of this saving clause, they are not chargeable with knowledge of the title in relation to moneyed corporations, and will not be presumed to have notice of the same. Ignorance of the law of a foreign government is regarded as ignorance of a fact, and may be relieved against in like manner as a mistake as to a matter of fact. (9 Pick., 130; 8 Barb.,
233.) The bondholders had a right to infer from the recitals in the trust deeds, the attestation clauses to the same, the letters of the officers of the company, and from the jus disponendi of corporations at common law, that such officers *Page 194 
had legal authority to execute such deeds and accompanying assignments, and to make and sell the mortgage bonds and they had a right to regard the execution of these instruments, by the proper officers of the company, as prima facie evidence of their authority to execute them. (Angel Ames on Corp., 270;Bank of United States v. Danbridge, 12 Wheat., 70, per
STORY, J.; 2 Metc., 166; Farmers' Loan and Trust Company v.Morse, Willard's opinion; Same v. Blake, id., and opinion ofChancellor, on Appeal, unreported; 7 Hill, 91.)
If Graham, one of trustees, was chargeable, as director of the company, with knowledge that there had been no previous resolution, notice to him was not notice to his cestuis quetrust. He did not stand to them in the relation of an agent. He was selected and appointed as trustee by the company, not by thecestuis que trust. His powers and duties were conferred and prescribed by the company, not by the bondholders. There were at the time of the execution of the trust deeds no bondholders; nocestuis que trust. It is a necessary attribute of an agency that it should be created by the principal; it is an agreement by which the principal confides to the agent the management of some business to be transacted in his name and on his account, and by which the agent assumes to do the business and render an account of it. (1 Bouv. Law Dic., 91, tit. Agency; 2 Kent's Com.,
612; Paley on Agency, 1.) The doctrine that notice to an agent operates as constructive notice to his principal, is applicable only to cases where an agency in fact has been created; and in such cases only where the notice is to the agent while engaged in the same transaction or negotiation to which the agency applies. (Dunlap's Paley on Agency, 262-266, and notes.) In this case, as the relation of principal and agent did not exist between the bondholders and Graham, notice to him, or knowledge by him that there was no previous resolution, was not constructive notice to the bondholders. *Page 195 
The trustees are not to be regarded as the purchasers of the bonds and mortgages assigned to them. No consideration proceeded from them; they were mere assignees of these securities, coupled with no interest, in trust to hold them as a security for the payment of all the mortgage bonds that should thereafter be sold or negotiated by the company, and after the payment of such bonds to hold the same subject to the disposition of the Company. Whoever purchased the mortgage bonds became purchasers of the bonds and mortgages so assigned as security for their payment, or of an equitable right to hold them as such security.
The purchasers of the four hundred and ninety-nine bonds, issued under the million trust, and the Palmers, as pledgees of the unsold bonds of both trusts, were purchasers for value, within the eighth section of the title in relation to moneyed corporations. The purchasers of the four hundred and ninety-nine bonds paid cash for the same, and the Palmers advanced cash, on the credit of the pledge to them of the unsold bonds as security for such advances. Mortgagees, who, at the time of becoming such, part with a new consideration on the faith of the mortgage, arebona fide purchasers for a valuable consideration, within the recording acts (1 R.S., 756, 762, §§ 1, 38, 1st ed.; 4Paige, 221; Rev. Notes to ch. 3 of 2d part of R.S.), and they are also purchasers within the statute in relation to fraudulent conveyances. (2 R.S., 134, 137, §§ 1, 7; 4 Greenl.ed. of Cruise, tit. 33, ch. 78, §§ 38, 39; Chapman v.Emery, Cowp., 279; Lister v. Turner, 5 Hare, 281.) Mortgagees of real estate, and mortgagees or pledgees of personal property, are, upon principles in analogy to those applicable to such statutes, also purchasers within the eighth section above referred to.
The only question, in this branch of the case, arises out of the delivery of the twenty-four bonds to Holford Co. as security for a preëxisting debt. Holford Co. cannot *Page 196 
claim to be purchasers in good faith for a valuable consideration, upon the principles applicable to the recording acts, or to the transfer of negotiable paper. A subsequent purchaser or mortgagee, without notice of a prior unrecorded conveyance or mortgage, cannot claim the benefit of the recording acts, as a purchaser in good faith and for a valuable consideration, unless he advances a present consideration, or relinquishes some available security, upon the faith of his deed or mortgage. If he received his deed or mortgage in payment of, or as security for, a preëxisting debt merely, without parting with anything of value, he is not a bona fide purchaser within such acts. (Dickinson v. Tillinghast, 4 Paige, 220.) The same principles applies to the purchaser of negotiable paper. To constitute a bona fide purchaser of a negotiable security for a valuable consideration, without notice of a prior equity, he must have taken it in the usual course of business, and paid a present value for it. If he merely received the paper in payment of, or as security for, a preëxisting debt, he cannot hold it against a prior equitable owner. (20 John., 637, in error; 6 Hill,
93, 95, 96.) But it seems to me that the principles of these cases do not apply to the case of Holford Co. Under the recording acts the question arises between several mortgagees, or persons who have acquired specific liens, or several purchasers from the grantor; and, in respect to negotiable paper, between the purchaser and the rightful owner of the same. In all such cases, to entitle a subsequent mortgage or purchaser to a preference over a prior unrecorded mortgage or deed, or a purchaser of negotiable paper to hold it as against the rightful owner, the former must have advanced a present consideration for his deed or mortgage, and the latter have paid value for his paper.
A preëxisting debt is in all cases a good and valuable consideration for the transfer of either real or personal property, as between the parties to the transaction. It is a valuable consideration also for a sale or mortgage in good *Page 197 
faith, within the statute in relation to fraudulent conveyances and the statute as to sales by a defendant in execution before an actual levy. (Birdseye v. Ray., 4 Hill, 162, 163; 2 R.S.,
366, § 17; Id., 134, 136, 137, 1st ed.) A debtor, although in failing circumstances, has a right to give a preference to one creditor over others; and he may pay or secure him by the sale or mortgage of his real or personal estate, before the lien of any other creditor has attached thereon. (Birdseye v. Ray, 4Hill, 163, supra; 11 Wend., 187.) Where the contest is between creditors endeavoring to obtain preference in payment of preëxisting debts, the creditor who first secures a specific lien on the property, by a purchase or mortgage from the owner, is entitled to hold it as against all the other creditors who have not previously acquired specific liens thereon, and also as against the debtor himself and his representatives. This was expressly decided in the Court of Errors, in Walker v.McDonald (6 Hill, 97, in error.) An exemplification of this principle is to be found in the case of Birdseye v. Ray (4Hill, 162), where it was held that a creditor of a defendant in an execution, to whom such defendant, after the issuing of the execution, but before an actual levy, turned out certain personal property as security for a preëxisting debt, was a purchaser in good faith, within the statute (2 R.S., 366, § 17, 1st ed.), and could hold the property as against the plaintiff in the execution. (5 Term R., 236; 3 Maule Selw., 371; Cowp.,
278; Prec. in Ch., 13; Coote on Mort., 355.) This decision was based upon the principle that, as between creditors having equal equities, the debtor may lawfully prefer one to the other, before the latter has acquired a specific lien, by an actual levy upon his property or otherwise.
The contest in the present case is between creditors of the corporation, to whom the twenty-four bonds in question have been pledged as security for a preëxisting debt, and the receiver of the corporation, appointed subsequent to the *Page 198 
pledge, and representing the corporation, its stockholders and general creditors: the precise case within all the cases, where a preëxisting debt is a valuable consideration for a sale or mortgage made in good faith. I conclude, therefore, that Holford Co., as pledgees of the twenty-four bonds, are purchasers for a valuable consideration, within the eighth section of the title in relation to moneyed corporations.
The next question to be examined is, whether the trust deeds and accompanying assignments are void under the ninth section of the title in relation to moneyed corporations, because made by the company when insolvent or in contemplation of insolvency, with the intent of giving a preference to particular creditors. To bring these securities under the condemnation of this section, they must have been executed by the officers of the company, with the intent of giving a preference to certain particular creditors over other creditors, when the company was insolvent, or when its insolvency was contemplated by its directors and officers. The intent to give a preference, and either an actual insolvency or a contemplation of insolvency, must be proved as facts. The intent and the contemplation of insolvency may be proved either by direct evidence, or inferred as the necessary consequence of other facts clearly proved. If insolvency is relied upon to defeat the securities, knowledge of the insolvency by the directors of the company, or a belief by them that it existed at the time the securities were made, must be proved; for an intent to give a preference to particular creditors, in fraud of all other creditors of the company, cannot be conceived, except as connected with a knowledge or belief that the company is insolvent, or with a contemplation of its insolvency. It is the intent to give a preference in violation of the statute, and in fraud of the general creditors of the company, which stamps the conveyance or assignment with criminality, and subjects the directors coöperating in such violation of the statute, *Page 199 
to punishment as for a misdemeanor. (1 R.S., 591, 592, §§ 9, 11, 1st ed.)
There can be no criminal intent to violate the statute and defraud the creditors, unless the conveyance or assignment is made with knowledge or belief of insolvency, or in contemplation of insolvency. If these elements are wanting in the transaction, the conveyance or assignment must be deemed to have been made in good faith, as a payment or a security, for a preëxisting debt, and not with intent to give a preference. (Jones v. Howland,
8 Metc., 382, 386; Denny v. Dana, 2 Cush., 171, 172; 1R.S., 591, 592, §§ 9, 10, 11, 1st ed.) It is quite apparent from the evidence, and especially from the correspondence of the managing directors and financial officers of the company, in respect to the million and first half million trusts, and the accompanying assignments, and the negotiation of the mortgage bonds issued under such trusts, that they had, at the time of the execution, and of issuing these instruments, no knowledge, suspicion or belief that the company was insolvent, and did not at that time, in the event of the sale of such bonds, contemplate its insolvency. I use the term insolvency, as meaning an insufficiency of the property and assets of the company to pay all its debts. The uniform and concurrent language, at this period of the history of the institution, held by its managing directors, in their letters to their foreign correspondents, expressed an earnest desire that the mortgage bonds should be negotiated in England, and a confident belief that if they should be cashed, all the engagements of the company could be met as they became due.
It is apparent, also, that the million and first half million trust deeds, and the accompanying assignments, were not made with any reference to the stoppage of payment by the company, and the liquidation and winding up of its affairs, but for the sole purpose of enabling it to continue its business, and to meet all its outstanding liabilities as *Page 200 
they became due in the usual course of business. The success of the directors, although achieved with great difficulty, in continuing the ordinary business of the company for upwards of a year and three months after the execution of the two trust deeds, and their accompanying assignments, and in being able during all that period to meet all the engagements of the company, by payment or the renewal of its obligations, conclusively shows that the directors could not, at the time of the execution of such trust deeds and assignments, have either contemplated the insolvency of the company, or have known or believed that it was insolvent. The insolvency intended by the statute was, in my opinion, an actual or absolute insolvency, by which is meant an inability of the company to pay all its debts from its own property. Another meaning is sometimes accorded to this term, especially in cases arising under the bankrupt act, viz., an inability of the debtor to pay all his debts as they become due, in the ordinary course of trade, as contradistinguished from the ultimate sufficiency of his property to pay all his debts upon the final liquidation of his affairs. The former is its primary or derivative, as well as its popular and literary signification. This is also its meaning, when contained in statutory provisions in relation to the frauds of insolvent debtors, except in cases where it is declared that a different meaning is intended. It is used in this sense in the title in relation to moneyed corporations. (Web. Dic., Insolvent and Insolvency; Bouv. LawDic., Insolvent; Whar. Law Lex., Insolvent; 2 Bell's Com.,
162; Herrick v. Borse, 4 Hill, 650; Stuart v. Mechanics'Bank, 19 John, 512, per SPENCER, Ch. J.; Fidgeon v.Sharpe, 5 Taunt., 539; 3 Wend., 594, 595, in error, per
SUTHERLAND, J.; S.C., 1 Paige, 515; Denney v. Dana, 2Cush., 171; Leitch v. Hollister, 4 Comst., 215; Gillett
v. Phillips, 3 Kern., 119.)
The word insolvency is defined by Webster, the "inabilty of a person to pay all his debts; or the state of wanting property sufficient for such payment." Bell, in his Com *Page 201 mentaries on the Laws of Scotland, vol. 2, p. 162, says: "It seems to have been held that the only conclusive proof of insolvency, is a comparison of the debts with the funds of the debtor; and in most legislative remedies provided against the frauds of insolvent debtors, c., it is to this sort of proof that reference has been made as the criterion of insolvency." InStuart v. Mechanics' Bank (19 John., 512), SPENCER, J., says: "A bank may be quite solvent, notwithstanding it fails to redeem its bills." DALLAS, J., in Fidgeon v. Sharpe (5Taunt., 539), says, "A man may stop payment and not be insolvent." GARDINER, J., in Leitch v. Hollister (4 Comst.,
215), defines insolvency to mean, "that all the assets of the insolvent, if honestly appropriated, will be insufficient to pay his debts;" and in Gillett v. Phillips (3 Kern., 114, 119), he interprets in like manner the word insolvent, as used in the identical section of the title in relation to moneyed corporations, under which the question we are now considering arises. He says: "When a moneyed corporation is insolvent in such a sense, that all its debts cannot probably be discharged from its assets, the payment of any one creditor in full is a preference within the meaning of the statute."
The title containing special provisions relating to certain corporations (§ 4), and the safety fund act (§ 25), recognize a distinction between a refusal to pay debts and insolvency. The same distinction is recognized in the article in relation to proceedings against corporations in equity. (2 R.S., 463, 1sted.) Questions in respect to the meaning of insolvency, in cases arising under bankrupt acts, are exceptions to the general rule. In such cases, the signification of the word is determined by the peculiar provisions of those acts.
Within the meaning of the English bankrupt acts, a trader is an insolvent when he is not a condition to pay his debts in the usual and ordinary course of trade and business. (Shone v.Lucas, 3 Dow Ryl, 218; De Tastet v. Le Tavernier, 1Keen, 161, 171; Bayley v. Schofield, 1 Maule *Page 202 Selw., 338; 2 Bell's Com., 162, 164; Everett v. Stone,
3 Story's, 453.) To determine whether the North American Trust and Banking Company was insolvent at the time of the execution of the trust deeds and assignments, a comparison must be made between its assets, at the then market prices and values thereof, and its debts. I infer from the evidence that the result of such a comparison would show a sufficiency of property belonging to the company, as thus estimated, to pay all its then outstanding liabilities. It seems that in December, 1840, some eight months after the execution of the trust deeds, a committee of the board of directors, after a minute examination of the affairs of the company, reported that it was solvent to the amount of $2,321,395.
If the company was not insolvent at the time of the execution of the trust deeds and accompanying assignments, within the meaning of the ninth section of the title in relation to moneyed corporations; or if it was insolvent, but the directors of the company had no knowledge or belief of such insolvency, and there were no circumstances which must or should have reasonably led them to believe that such insolvency existed; and if they did not at that time contemplate or anticipate the insolvency of the company, these deeds and assignments are not void under the sections referred to, although the company may at the time have been in an embarrassed condition in consequence of its want of a cash capital to enable it to meet its maturing obligations.
Although a moneyed corporation is embarrassed in its financial condition; although it fails to discharge its liabilities as they mature, and even stops payment; yet if it is entirely solvent, and there is no probability of insolvency, and no contemplation of it, its directors, entertaining a bona fide expectation of extricating it from its embarrassment, may sell, or assign, by way of hypothecation, a portion of its assets for the purpose of raising money to *Page 203 
accomplish that object by the payment of its debts; and such conveyance or assignment will not be deemed fraudulent or a violation of the ninth section of the title in relation to moneyed corporations. (Gibson v. Boutts, 3 Scott, 229, 238,Eng. Com. Pl. and Exchequer Chamber; Harwood v. Bartlett, 6Bing. N.C., 61; Greenwood v. Churchill, 1 Myl. Keene,
546; Fidgeon v. Sharpe, 5 Taunt., 539; Bittleston v.Cooke, 36 Eng. L. Eq. R., 97.) A contemplation of insolvency is where the debtor, having full knowledge of his embarrassed circumstances, has no hope or expectation of relief, and anticipates an entire failure in business and absolute insolvency; or when his circumstances are such that any prudent man, taking a reasonable view of his situation and of the surrounding circumstances, might at the time fairly expect insolvency to follow. (Gibson v. Muskett, 3 Mann. Gr.,
158, 168.) In such cases the question is, was the money paid, or property assigned, with a view to a fraudulent preference, and also in contemplation of insolvency? (Flook v. Jones, 4Bing., 20; Fidgeon v. Sharpe, 5 Taunt., 539.) If the debtor believes he has funds sufficient to pay all his debts, and does not anticipate insolvency, his conveyance of his property cannot be impeached.
Under the English bankrupt acts, if a debtor, after committing an act of bankruptcy, pays a demand to his creditor, on a surrender by the latter of a lien for such demand, such creditor cannot be divested of the money so paid to him; as he cannot be placed in a worse situation than he would have been if he had retained his security. (Thompson v. Beatson, 1 Bing., 145;Mavor v. Croome, Id., 261.) The principles of these cases applies to the pledge of the mortgage bonds to the Palmers, as a substituted security in place of the state stocks surrendered by them to the company, upon the faith of such pledge.
Under the English bankrupt acts, contemplation of bankruptcy cannot be inferred from mere insolvency; there must be an actual contemplation of a failure in business, a *Page 204 
stoppage of payment. (21 Verm., 616; 3 Story, 386, 544.) Under these acts, if the debtor honestly believes he is able to go on in his business, and with such belief pays a debt, without design to give a preference, such payment is not fraudulent, although insolvency then exist, and bankruptcy afterwards ensues. (8 Metc., 385, 386, 387.)
It is said a party must be supposed to intend the natural results of his condition and acts. But this proposition must be received with qualifications. The result cannot always be relied upon as evidence of the imputed intent. We must judge of the acts as they appeared to the debtor at the time they were transacted, not as they appear to the observer after the result is known. We all know that an embarrassed debtor often goes on after his condition is irretrievable, with confident hopes of relief. (Jones v. Howland, 8 Metc., 386, 387, per HUBBARD, J.)
The next question to be examined is, whether the trust deeds are void upon their face, because made in trust for the use of the company, and also whether they were made with intent to hinder, delay and defraud creditors.
If the trust deeds and accompanying assignments were made, and intended to operate only as mortgages of a part of the capital of the company, to secure future advances to the company by way of loan for lawful purposes, they do not come within the condemnation of the section in relation to transfers of personal property in trust, for the use of the vendor. (2 R.S., 135, § 1.) That section has no application to assignments or conveyances in trust given by way of mortgage, or hypothecation, as a security for a loan of money, or a preëxisting debt. It applies to a conveyance or assignment made in trust, where the principal motive of the person making it is, to reserve or secure to himself the entire, or at least a part of, the beneficial use of the property. If the only object of the conveyance or assignment is to secure the payment of a loan of money, or of an existing debt, and the express reservation or resulting of the *Page 205 
residuary beneficial interest in the property is a necessary incident of the conveyance in trust, and not one of its objects, the section in question has no application. (5 John., 335, 345; 2 Seld., 516; 4 Comst., 216.) In all cases of a mortgage, whether created in the form of a trust or otherwise, the mortgagee acquires only a specific lien on the property transferred, and the whole residuary interest therein remains in, or results by implication of law to, the grantor; and an express reservation of such residuary interest, being nothing more than what results to the party making the assignment, by operation of law, will not vitiate the assignment.
Such an express reservation has not the effect of hindering or delaying creditors. The assignee acquires no legal or equitable title to the property, only a specific lien thereon. The residuary interest of the assignor may be immediately reached by his creditors by means of an execution, if the property assigned is a chattel, or by a complaint in the nature of a bill in equity, or by proceedings supplementary to an execution, if the property is a chose in action. The creditor without any delay, can attach the interest of the debtor in the property, and can enforce its sale, subject to the specific lien, to obtain satisfaction of his debt; and if the debtor has given the mortgage security in the form of a trust, the creditor will not be compelled to postpone proceedings against the property until the determination of such trust. These principles were advanced by Judge GARDINER, and unanimously adopted by the Court of Appeals, in Leitch v. Hollister (4 Comst., 216), and they are conclusive upon the point I am now discussing, if the trust deeds and accompanying assignments are in legal effect mortgages to secure the payment of the mortgage bonds. In the case ofLeitch v. Hollister, the debtor assigned to three creditors a chose in action, declaring therein that the amount realized by them should be applied in the payment of his indebtedness to each of them, in equal proportion to the amount of *Page 206 
their respective demands, the balance to be returned to him, the debtor.
It is apparent upon the face of the trust deeds and accompanying assignments, and from the evidence in the case, that the object of the officers of the company, in making the instruments, was to obtain a loan of money by creating a mortgage or pledge of the bonds and mortgages assigned, to secure the payment of the mortgage bonds to all persons who should thereafter advance money on such bonds to the company on the credit of such securities; and it is furthermore apparent that it was not one of the objects of these securities to create a trust for the use of the company. A trust as to the surplus, after the mortgage bonds should be satisfied, was not one of the objects had in view when the trust deeds were executed. The uses reserved in the deeds in favor of the company are precisely those which would have resulted in its favor by operation of law. The deeds declare that the trustees shall hold the bonds and mortgages assigned, in trust for the company, until default be made in payment of the mortgage bonds, and until that time to permit the company to receive the interest which shall accrue thereon; and upon such default, to make collections on the bonds and mortgages, and to pay the same to the London agents, to be applied by them in payment of the mortgage bonds, and after the bonds are paid to return the securities to the company. The uses thus reserved are the same, and no other, as would have resulted to the company by operation of law, in case no such reservation had been made. It is, therefore, evident that these trust deeds, being nothing but mortgages given to secure the payment of a loan of money, and for that object only, do not belong to that class of instruments which are condemned by the section of the Revised Statutes in relation to conveyances of personal property in trust for the use of the vendor. (2 R.S., 135, § 1.) *Page 207 
No sound objection can be taken to these mortgages, because they are created in the form of trusts, and by means of conveyances to third persons. Precisely the same thing was done in the mortgage of the Merchants' Exchange Company to James G. King, as trustee, to secure the payment of money to be advanced to the company on its bonds; and that mortgage was held by the Court of Appeals, to be a valid security. (1 R.S., 727; 1Seld., 547.) By the trust deed in that case, the real estate was conveyed to King in trust for the use and indemnity of the bondholders; upon condition, however, that if the company paid the bonds, the estate granted should determine, c. It was held by this court, in respect to this deed, that it conveyed no title; that it was a mortgage, a mere security for a debt; and that the title remained in the mortgagor. If the mortgage of the Merchants' Exchange Company was valid, although it was in the form of a trust, I cannot see why the mortgages in this case should be deemed invalid because they were created in the same form. Express trusts, in personal property, may be created for any purpose which is not illegal. The article in relation to uses and trusts has no application to this kind of property. (8Paige, 305.)
If the trust deeds, and accompanying assignments, were executed for the sole purpose of borrowing money to enable the company to pay its existing debts, and to continue its business, and not with reference to its insolvency and a liquidation (as I think the case shows); and if these instruments do not contain provisions which necessarily have the effect of hindering and delaying creditors, we are not authorized, in the absence of any proof of actual fraudulent intent, to infer from the evidence that they were made with intent, to hinder, delay and defraud creditors.
I think the error of the counsel of the receiver, in this part of the case, consists in assuming that the trust deeds had the effect of hindering the creditors in the pursuit of their ordinary legal remedies, in respect to the assigned *Page 208 
property. This error is made perfectly apparent by the reasoning of Judge GARDINER, in Leitch v. Hollister (4 Comst., 216), before referred to. If the trust deed and accompanying assignments are in legal effect only mortgages, mere securities for the payment of money, the bondholders and trustees acquired only a specific lien on the bonds and mortgages assigned, and there was no obstacle in the way of the general creditors in pursuing their ordinary remedies against the assigned bonds and mortgages. If the proper legal proceedings had been instituted by such creditors before the sale of any of the mortgage bonds, the negotiation of them by the company would have been arrested; and if such proceedings had not been commenced until the negotiation of the bonds, the creditors would have secured a lien on the assets assigned, subject only to the payment of the bonds previously negotiated.
It is an established principle, that a mortgage, executed to secure the repayment of future advances, is valid in respects to all such advances as shall be made prior to the time when creditors shall obtain a lien on the property mortgaged. (16John., 165; 2 John. Ch. R., 309; 5 id., 326; 6 id., 429.) The present case comes within the principle of these decisions. Whenever the design of a debtor is to raise funds for the payment of debts and the continuance of his business, an assignment or transfer of a portion of his property as security for present or future advances is unobjectionable, although a trust as to the surplus results by operation of law, or by virtue of an express reservation in the deed. But if an assignment is made by a debtor when in failing circumstances, which looks to a final liquidation, and implies an inability to meet his engagements, it will be invalid, unless it is an unqualified devotion of the assets assigned to the payment of all his debts, without any reservation of an interest therein to the prejudice of his creditors. The trust deeds and assignments, in question in *Page 209 
the present case, I think are embraced in the former class of assignments and conveyances.
The next question to be examined is the proposition of the receiver, that the trust deeds are void, because given to secure the payment of instruments called bonds, which were illegal contracts, the company having no power to give them, and the issuing of them being expressly prohibited by statute; and that the coupons annexed to the bonds are open to the same objections as exist against the bonds. Under this general proposition, it is insisted by the counsel for the receiver: First. That the company had no power to borrow money; Second. That it had no power to issue time paper, sealed or unsealed, for that purpose; Third. That the banks had no such power previous to the safety fund act of 1829, and the act of 14th May, 1840, prohibiting its exercise, the issuing of such paper being contrary to public policy; Fourth. That the bonds issued, after the act of 1840, were forbidden by that act; Fifth. That they were prohibited by the safety fund act; Sixth. And that they were issued in violation of the restraining law.
The statutory declaration, that a corporation has no corporate powers except those expressly given in its charter and such as shall be necessary to the exercise of the powers so given, is only declaratory of the common law rule on the subject. (1R.S., 600, § 3, 1st cd.; 15 John., 358, 383.) Every corporation has certain powers and capacities, which are, at common law, incidental to its existence. Among these are the powers to take and grant property, and to contract obligations. (2 Kent's Com., 278; 15 John., 383 4 Wheat., 658; 1 Kyd onCor., 13, 69, 70.) These general powers may be curtailed by the act of incorporation, and restrained and qualified by the nature and object of the corporation. When the charter is silent as to the contracts which a corporation may make, it has, as incidental to its existence, the power of making all such contracts as are necessary and usual, in the course of the business it transacts, *Page 210 
as a means to attain the object for which it was created. (Ang. Ames Corp., 83, 84, 245, 3d ed.; 2 Kent's Com., 278, notec, 7th ed.; 15 John., 383, per THOMPSON, J; 1 Sandf. Ch.R., 288, 289.)
The power of the North American Trust and Banking Company to borrow money may be maintained, as an incidental power necessary to carry on the business of banking. This power has always been claimed and exercised by banks of discount in all commercial countries. In the original charter, granted in 1694, to the Bank of England (Act of 5 and 6 William and Mary, ch. 20), the power of that bank to borrow, as an incidental power, was conceded by imposing a restriction in respect to the amount to be borrowed. The same concession was made by the enactment of the several acts of the British Parliament, restraining in favor of the Bank of England, all corporations, c., from borrowing money on their notes, payable at a less time than six months. The Scotch banks exercise this power. It is one of the principal sources of their profits, to borrow at a low rate of interest, and lend at a higher. (3 Edin. Encyclo., tit. Bank, 220, 224;Cyclopadia of Arts, c., tit. Bank; 1 Chitty on Bills, 15, 16.) Beawes, in his Lex Mercatoria, 384, says: "That the legitimate business of a bank of discount, deposit and circulation, consists in borrowing money upon their own credit; lending money on good securities; buying and selling bullion; discounting bills of exchange or other secure debts; and receiving and paying the money of other persons." And at p. 398, he says: "The Bank of England may borrow money on any contracts, and may give such security as shall be satisfactory to the lender." This power was always exercised by the old incorporated banks of this state, and it has also been exercised by the banking associations since the passage of the act authorizing their formation. It has been exercised by these banks as a legitimate power of banking, and as the necessary and usual means to enable the banks to carry *Page 211 
on the business of banking. It is conceded that this power is an attribute of a system of legitimate banking; but it is insisted that the act of April 18, 1838, to authorize the business of banking, denies this power to banking associations. It is assumed that the act, unlike previous bank charters, particularly specifies all the powers intended to be granted; and it is therefore, and upon this assumption, argued that the power to borrow is denied, upon the principle that, in such a case, every power not expressly granted, is impliedly prohibited. Expressiounius est exclusio alterius. I think it will be found, upon an examination of the act to authorize the business of banking, and of the previous acts incorporating the safety fund banks, that there is no essential dissimilarity between them, in respect to a particular enumeration of the powers expressly granted, although there is between that act and the banks created previous to the adoption of the safety fund act. The only essential difference between the act to authorize the business of banking and the acts incorporating the safety fund banks, consists in the insertion, in the charters of the safety fund banks, of restrictive clauses, prohibiting such banks from trading in goods and in United States and state stocks, unless in selling the same when pledged to them by way of security for debts, which are not contained in the act to authorize the business of banking.
The banking powers granted to the safety fund banks, and to banking associations, are substantially the same, and are specified with equal particularity and definiteness. (Laws of
1838, 246, 249, 250, §§ 3, 18, 24; Laws of 1832, 240, §§ 3, 4, 5, and pp. 43, 44, §§ 3, 4, 5, c.) The only restrictive clause, in the charters granted prior to the safety fund act, was the same as the one contained in the banks incorporated under that act.
The restrictive clause in the charters granted previous to 1838, in relation to trading in goods and stocks, was unnecessary. The chartered banks would not have possessed *Page 212 
the power to trade in goods and stocks, had this restrictive clause been omitted. Their powers were restrained by the nature and purposes of their incorporation. They could only, in the absence of such restriction, have exercised the powers expressly granted, and such other incidental powers as should be necessary to carry on the business of banking. Such is the express declaration of the Revised Statutes (1 R.S., 600, § 3), and which is merely an enactment of the common law. Without any restrictive clauses, they could not have trafficked in goods, nor insured property against loss by fire, nor insured lives, nor granted annuities, nor constructed railroads, nor engaged in manufactures, or in any business except the business of banking, and could have exercised no powers except those incidental to that business. (Ang. Ames on Cor., 84, 85; 4 Peters, 152, 168; 15 John., 383; 1 R.S., 600, § 3, 1st ed.; 2 Kent'sCom., 299.) If this proposition is not sound, then the old chartered banks had the implied power to engage in any and every kind of business, no matter how foreign to the business of banking, except the trading in goods and stocks, to which the restriction in their charter was confined; and this power could have been defended upon the principle of expressio unius estexclusio alterius, urged in this case against the power to borrow money; for it could have been argued that the express prohibition against dealing in goods and stocks, was an implied grant of all other corporate powers. In neither the old charters or in the general banking law; are there inserted in connection with the express grant of banking powers, as will be found in the charters of the Bank of France and of the Bank of the United States (Act of United States, of April 10th, 1816, § 17;Edinburgh Encyclopædia, tit. banks), negative words in respect to the exercise of any powers other than those expressly granted. And the only sound and safe doctrine, therefore, both as it respects the safety of the corporation and the protection of the public, is, to regard the powers of corporations as limited, as well by *Page 213 
the purposes of their creation, as to those powers which are expressly granted, and to such incidental powers as are necessary to the exercise of those enumerated, and also to such general powers as are, by the common law, tacitly annexed to every corporation, unless prohibited by statute or its charter, or restrained or qualified by the nature and objects of the corporation. There is no necessity for the strict construction of the act to authorize the business of banking contended for, as the result (of unlimited powers) apprehended, could not follow from the adoption of the construction applied to previous charters. The Revised Statutes and the common law, deny to corporations all powers except those expressly granted, and such incidental powers as are necessary to their exercise, and also such general powers as are incidental to the existence of every corporation. It is, therefore, apparent to my mind, if the banks, under the old system, had the right to exercise the power to borrow money for the legitimate purposes of banking, which is conceded, that the present banking associations possess the same power. This power is, however, limited to the purposes of the association. It can only be defended when exercised to aid in carrying on the legitimate business of banking. It cannot be exercised to accomplish any object foreign to the legal objects for which the organization of the corporation was authorized. With these limitations, I think the power of banking associations to borrow money for the lawful purposes of the corporation is unquestionable.
This power may be exercised under the general power tacitly annexed to every corporation, when created, to contract obligations as a necessary and directly appropriate means to enable it to conduct the business for which it was created. (2Kent's Com., 278, and note c; Ang. Ames on Cor., 245.) Under this general power to contract obligations, a banking association may make all such contracts as are necessary and usual in the course of its business, as a means to enable it to carry on the business of banking. *Page 214 
The exercise of the power to borrow money is usual in the course of the ordinary business of a bank; and it is directly and immediately appropriate to the execution of the expressly granted powers. It is not prohibited by the act to authorize the business of banking, nor is it restrained or qualified by the nature and object of the corporations organized under that act. Being a power, then, neither prohibited nor inconsistent with the nature and objects of a banking association, if its exercise is necessary and usual in carrying on the business of banking, and if it enables the company to accomplish the purposes of its creation, it is an essential attribute of the corporation, tacitly annexed to it by the common law. (Ang. Ames on Cor.,
83, 84, 245; 15 John., 383; 2 Kent's Com., 278, and note c,
7th ed.)
This power to borrow money for the legitimate purposes of the company may also be maintained as a power conferred upon it by the express terms of the general banking law, as an incidental power necessary to carry on its business of banking. It may be supported as an incident to some, if not to all, of the specific powers expressly granted, viz., the power to discount notes, c., to receive deposits, to buy and sell gold and silver bullion, and bills of exchange, to loan money, to purchase public stocks to deposit with the comptroller, and such real estate as it was authorized to purchase. The old chartered banks exercised the power to borrow, to enable them to discount notes. I can see that a prudent exercise of this power by a bank, in anticipation of receipts from the payment of its outstanding paper, for the purpose of accommodating its customers, may be an appropriate means to enable it to exercise the power of discounting notes. So borrowing money to provide funds to be placed temporarily in the hands of a foreign correspondent, in anticipation of those to be supplied in the regular course of business, may be so useful and appropriate as to be regarded as an incidental power necessary to the sale of bills of exchange. But whatever may be the better opinion in respect to the exercise *Page 215 
of this power as incidental to discounting notes and selling bills of exchange, I apprehend no doubt can be entertained of the right of a banking association to exercise it as a means to enable it to repay deposits, to pay a debt contracted in the purchase of bullion or foreign coins or bills of exchange, or to pay the price of public stocks or the consideration of real estate purchased. The express grant of the general power to buy gold and silver, bullion, c., bills of exchange, public stocks and real estate, implies the power to purchase these things on credit; and the power to contract debts is a necessary result of the power to buy on credit. The debts of a banking association, thus legally contracted in the course of its legitimate business, may become due at a time when, in consequence of unexpected losses or an unforeseen drain on its cash resources, the company, although perfectly solvent may be unable to pay them. In such an emergency has not a banking association the power to extricate itself, and thus to avert its ruin by means of a temporary loan of money? It is very apparent to me that these associations, when placed in such circumstances, and even under any circumstances, have the power to borrow money for the purpose of paying their lawful debts. The consequence of a neglect or refusal to pay their bills or notes would be the loss of their credit; the forced sale of their securities, in the hands of the comptroller; the sacrifice of their assets and their dissolution. To avert such disastrous consequences, a loan ought to be regarded as the exercise of an incidental power necessary to carry on the business of banking, or necessary to the exercise of the powers expressly granted, or as incidental to the existence of the corporation.
The exercise of the power to borrow money for the specific purpose above mentioned, comes within the definition given by Judge ELLSWORTH, of an incidental power, in the case of Hood v.New-York N.H.R.R. Co. (22 Conn. 16), cited by the counsel of the receiver. He defines such a power to be one which "is directly and immediately appropriate to *Page 216 
the execution of the specific power granted, and not one that has a slight or remote relation to it."
I am aware that it is objected to the necessity of the exercise of this power to borrow, that a banking association may meet its liabilities by the re-discount of its discounted paper or the sale of its other assets. I apprehend that this is not a sound objection to the exercise of the power to borrow. It may not in all cases be possible for the association to obtain a re-discount of its paper, or to sell any portion of its assets in time to meet a pressing emergency; while it may be able, upon the credit of its corporate liability, in connection with an hypothecation of a portion of its assets, to obtain a loan. And, if it should be able to obtain a re-discount of its paper, it would probably be required, in accordance with the usage of banks to superadd its guaranty or endorsement.
If the object of denying to banking associations the power to borrow money, and the use of their credit, is to confine their operations to the use of their capital, in order to create a check against their improvidence, the absolute sale of securities which form their capital, accompanied by covenants of guaranty and indemnity, would have a like tendency, to defeat this object, as a loan secured by an hypothecation of such securities. In both cases an indebtedness would be created, although in one case it would be contingent, and in the other absolute. The same objection which is made to the exercise, by an association, of the power to borrow, may, for like reasons, be made against the power to alien. Neither of these powers are enumerated in the act to authorize the business of banking, and the one does not violate the principles of public policy any more than the other. Neither can exist except as incidental powers, or as general powers which the common law tacitly annexes to every corporationeo instanti it is created, unless expressly prohibited by law or its charter. (2 Kent's Com., 281; 3 Barb. Ch. R., 122; 3Comst., 238; 3 Wend., 13.) I can clearly *Page 217 
see that cases may arise, in which the exercise of one or both of these powers may be necessary to protect a banking institution from ruinous loss, and even to preserve its very existence.
A banking association may unquestionably buy gold and silver bullion, c., on credit. The act expressly grants the general power to buy, without restricting the exercise of the power to either a purchase for cash or on credit. It follows, necessarily, from this unrestricted grant, that the purchase may be made in either mode. Now, what is a purchase on credit but a buying of the article sold, and a borrowing of the price. It is in substance the same transaction, as if the purchaser had paid the price to the seller, and then had immediately received it back on a loan, The contract of borrowing, for all practical purposes, exists as much in the one case as in the other. Is not this, then, an emphatic recognition of the right of a banking association to exercise the power to borrow money, as an incidental power. The same remarks apply to the powers to buy bills of exchange, public stocks and real estate. Again, what is the power to receive deposits, but a power to borrow? It is, in every sense of the term, a loan. The money deposited, if a general deposit, becomes the property of the deposit bank, and the latter becomes a debtor, and the depositor a creditor to the amount of the deposit. (2 Seld. 416, 417.) This express power to receive deposits is another recognition of the right to exercise the power to borrow.
The general understanding in respect to the construction of a statute, and the usage of all persons in a particular business in accordance with such understanding, is always regarded as of great weight in fixing the construction of such statute. "Contemporanea expositio est optima et fortisima in lege." (Broome's Legal Maxims, 532.) The general understanding of bankers and the usage of the banking associations have, ever since the passage of the general banking law, been in accordance with the right claimed by these associations *Page 218 
to borrow money. The state has recognized this right by loaning from time to time the surplus revenues of the canal fund to these associations.
An express authority is not indispensable to confer upon a corporation the right to borrow money, to deal on credit, or to become a party to a promissory note or bill of exchange. It is generally sufficient, if such right be implied, as the usual and proper means to accomplish the purposes of the charter. (Ang. Ames on Corp., 86, 234, 3d ed.; Grant on Corp., 276; 3 Sandf.Ch. R., 339, 347, 349; 1 id., 280; 3 id., 34; Chitty onBills, 15; Story on Bills, § 74, 15 John., 44, 52; 3 Bar. Ald., 1, 7, 11; 2 Kent's Com., 299.) BEST, J., in Broughton
v. Salford Water-Works (3 Bar. Ald., 1, 11), says: "When a company like the Bank of England or East India Company are incorporated for the purposes of trade, it seems to result, from the very object of their being, that they should have power to accept bills or issue promissory notes." It has been repeatedly decided in this state that a corporation, without any express power in its charter for that purpose, may, when not expressly prohibited by law, make a promissory note payable either at a future time or upon demand for a debt contracted in the course of its legitimate business; and that this power is incident to all corporations. (9 Paige, 476; 2 Hill, 267; 1 Cow., 513; 3Wend., 94; 4 Hill, 265.)
The power of the North American Trust and Banking Company to borrow money may also be maintained upon judicial authority. There has not been a single decision of any court of this state, which has come to my knowledge, against the existence of this power, while several have been made in favor of it. Vice-Chancellor McCOUN decided, in Leavitt v. Yates (4 Edw.Ch. R., 165), that banking associations possessed the power to borrow, as incidental to the power of discounting notes, of buying bills of exchange, bullion and foreign coin, and also of buying state stock to be deposited with the comptroller. A like decision was made by Assistant Vice-Chancellor SANDFORD, inBoisgerard v. *Page 219 The New-York Bank Company (2 Sandf. Ch. R., 23), and by the general term of the Supreme Court of the first district, inLeavitt v. Blatchford (5 Barb., 23, 24.) In this last case, EDWARDS, J., defended the power of banking associations to borrow, as a necessary incident to the power to become indebted. (P. 24.) In Beers v. The Phœnix Glass Company, the general term of the second district (14 Barb., 358), held that every incorporated company possessed the power to borrow, without any express grant for that purpose, in all cases where its exercise was essential to the transaction of its ordinary affairs. Judge S.B. STRONG, in delivering the opinion of the court, held that the Phœnix Glass Company, the defendants in that suit, had the right to borrow, to pay for materials purchased for their factory, or the wages of their operatives, or whenever essential to conduct any of their legitimate operations; but that the exercise of the power must be limited to and for the appropriate business of the corporation. The same decision was made by Assistant Vice-Chancellor SANDFORD, in Barry v. The Merchants'Exchange Company. (1 Sandf. Ch. R., 288, 289, 290, 312.) The right of a corporation to borrow money is conceded in the case ofThe Life and Fire Insurance Company v. The Mechanic FireInsurance Company of New-York (7 Wend., 31.) It has been frequently decided that insurance companies, without an express grant of the power to borrow, may exercise that power to pay losses. It is regarded as a power implied by the common law, as essential to accomplish the objects of the corporation. (Furniss v. Gilchrist, 1 Sandf. S.C.R., 53, per OAKLEY, C.J.; Brown v. Harbeck, 1 Duer, 114.) The existence of this power, as incidental to every corporation, unless expressly prohibited, or inconsistent with the nature and object of the corporation, has been repeatedly recognized by this court as a well established principle. In Leavitt v. Palmer (3 Comst.,
19), same as Leavitt v. Blatchford (5 Barb., 9), the learned counsel for the receiver did not, as appears from *Page 220 
his reported argument, deny the power of banking associations to borrow money; and its existence was plainly conceded by Judge BRONSON in his opinion delivered in the case. Although Judge BRONSON, in his opinion, condemns the notes issued by the North American Trust and Banking Company, because made payable on time, yet he expressly affirms the legal liability of the company on account of which the notes were given. (3 Comst., 34, 36, 37.) This concession of the existence of the power to borrow is made more apparent from the fact that a question was raised in the Superior Court in regard to this power, and was fully discussed by Judge EDWARDS, in his opinion delivered in that court. Judge DENIO, in his opinion, prepared at the request of the receiver, expressly admits the right of banking associations to borrow; he says it is a necessary incident to the business of a banking company. The existence of this power, as incidental to every corporation, with the qualification before named, may be inferred from the determination of this court in favor of the doctrine of incidental powers, in the case of The Farmers' Loan and TrustCo. v. Clowes (3 Comst., 470, 473.) The Farmers' Loan and Trust Co. had powers expressly granted to it to insure upon lives, to grant annuities, and to assume and execute trusts, but no express power to loan money had been conferred. The court decided that the company had, by implication, the power to loan money, as a proper and necessary means to enable it to accomplish the purposes for which it was incorporated. If the power to loan money may be implied, as necessary to the existence of certain enumerated powers, so may the power to borrow money. But the question of the implied power of a corporation to borrow money was expressly raised in this court, in King v. The Merchants'Exchange Company (1 Seld., 553, 557), and was passed upon by the court. The Merchants' Exchange Company was authorized by its act of incorporation to purchase real estate, and to erect an exchange thereon for the accommodation *Page 221 
of the merchants of New-York, and to receive the rents and divide them among the stockholders. Banking privileges, and power to engage in any other business, except as was proper and necessary to carry into effect the declared objects of the act, were expressly prohibited, and no power to borrow money was granted. The company had made and issued bonds for the purpose of borrowing money to enable it to complete the building, then being erected for the purpose authorized by the act; and had executed a mortgage to James E. King, in trust, as a security for the payment of the bonds. A bill was filed to foreclose the mortgage; and when the final decree was made in the Superior Court of New-York, to which the cause had been transferred, establishing the validity of the bonds and mortgage, and referring the cause to a referee, the counsel of the company was accidentally absent. The company afterwards applied for a rehearing of the cause, which was denied, and a final decree was made confirming the report of the referee, and ordering a sale of the mortgaged premises. From this decree the company appealed to the Court of Appeals, c. In the Court of Appeals the cause was argued upon the merits, and the question as to the validity of the bonds and conveyances in trust, and the right to borrow money, were distinctly raised and presented to the court. The court decided the cause upon its merits. Judge FOOT, who delivered the opinion of the court, states expressly that the decision was made upon the validity of the trusts contained in the mortgages. The decision that the bonds and mortgages were valid securities, necessarily involved a decision in favor of the power of the company to borrow money; for it was not possible to determine the validity of the bonds and mortgages without a determination that the company had the right to borrow money. The two things were inseparable. We must regard this case, therefore, as establishing the principle that the power to borrow money is incidental to every corporation, unless expressly *Page 222 
prohibited, or inconsistent with the nature and object of the corporation; and especially if it is a proper and necessary means to enable it to accomplish the purposes for which it was incorporated.
The reasons above stated, in my judgment, clearly establish the proposition that the mortgage bonds in question in this suit are not invalid, upon the ground that they were given to the holder for money borrowed by the company.
It is also insisted, on the part of the receiver, that the company had no power, prior to the act of 1840, to issue time paper, upon the ground that the issuing of such paper was contrary to public policy. The case of Safford v. Wykoff (4Hill, 442), in the Court of Errors, establishes a contrary doctrine. In that case, a negotiable draft, upon the cashier of the North American Trust and Banking Company, issued by a banking association in favor of a third party as payee, payable on time, and signed only by the cashier, but not countersigned by the comptroller, was decided to be a valid instrument, and binding on the association. Senators Hopkins and Bockee delivered the prevailing opinions, and it must be presumed, especially under the decision in James v. Patten (2 Seld., 15, 16, 18, 19), that the opinions expressed by them, in respect to the questions which arose in the cause, and in which they agreed, were adopted by a majority of the court. They held, that as the draft bore no resemblance to a bank bill or circulating note, and was not calculated to form a part of the circulating medium, and as there was no evidence that it was put in circulation as money, it was not a violation of the restraining law; and that the association had a right to issue it as an incidental power necessary to the carrying on of the business of banking, and especially as necessary to the exercise of the expressly granted power to buy and sell bills of exchange; and that the draft having been issued before the act of 1840, its being payable on time was no objection to its validity. This decision is a direct authority in favor of the right of *Page 223 
banking associations to issue time paper, prior to the act of May 14, 1840.
If the views urged upon us by the counsel for the receiver, in respect to this question, had been entertained by the majority of the members of the Court of Errors, in Safford v. Wyckoff,
who united in a reversal of the judgment of the Supreme Court, their decision in that case must necessarily have been the converse of the one actually made. For, if that majority believed that banking associations had no power, even prior to the act of 1840, to issue paper on time, they must necessarily have decided that the draft in question was void. Their decision in favor of the validity of such draft is, therefore, an express adjudication that banking associations, prior to the act of 1840, possessed the power of issuing time paper. This decision, being directly in point upon this question, must be regarded as conclusive, upon the principle of stare decisis.
But, irrespective of its being an authoritative adjudication, I think it can be sustained upon both principle and authority. Prior to any statutory prohibition against the issuing by banks of promissory notes or bills of exchange, payable on time, they exercised the power of issuing such paper, without its being questioned by either the civil authorities or judicial tribunal. Judge HAND says, in his opinion in the Indiana case, that he knew of no principle of the common law which required the bills or notes of banks to be made payable on demand. In the absence of any statutory prohibition, a chartered bank, under an express grant of the general power to issue notes and bills without any limitation or qualification, as to the mode or manner in which they are to be issued, may issue such paper either on demand or on time. The effect of time paper, upon the circulating medium and upon the banks, proving mischievous, a prohibition against issuing it was inserted in the safety fund act of 1829. This prohibition. however, was applicable only to the banks subject to the provisions of that act. Banking *Page 224 
associations, after 1838, having engaged in issuing the same paper, the act of 1840 was passed to extend a like prohibition to those associations. Judge BRONSON, who delivered the opinion of the court, in Leavitt v. Palmer (3 Comst., 32-34), did not express any doubt in respect to their power to issue such paper, prior to the act of 1840; and it is plainly inferable, from his opinion, that he believed they had this power. In Talmage v.Pell (3 Seld., 328, 347), in which case time certificates of deposit had been received, previous to the act of 1840, by the State of Ohio, in payment of state stocks, from the North American Trust and Banking Company, Judge GARDINER, who delivered the opinion of the court, made no suggestion that the certificates were void because contrary to public policy, and he expressly disclaimed the consideration of the question, whether the certificates of deposit were void, under the first and thirty-fifth sections of the safety fund act, because payable at a future day. It is very evident that the banks of Venice and Amsterdam, which were banks of deposit merely, issued certificates of deposit, payable on time. And in England, instead of notes payable on time being void, all notes of joint stock banks, and banking partnerships consisting of more than six partners, doing business in London, or within sixty-five miles thereof, are by statute prohibited, unless made payable more than six months from date. The act of 1838, to authorize the business of banking, plainly contemplates the issuing, by banking associations, of evidences of debt, other than circulating notes, not intended to perform the office of circulating notes, or to be put in circulation as money, and not calculated to form a part of the currency of the country, such as drafts and bills of exchange drawn against funds on deposit with corporations or individuals, for the payment of balances, or sold to customers; certificates of deposits given to depositors, founded on actual deposits, and notes given for debts contracted in the course of the legitimate banking business of the association and within *Page 225 
the scope of its legitimate purposes, and obligations or contracts given specially for the repayment of borrowed money. The issuing of these evidences of debt, especially drafts, bills of exchange, and certificates of deposit, form a part of the daily operations of every bank. The right to issue them is an incidental power necessary to the carrying on of the ordinary business of banking. The act to authorize the business of banking, does not require these evidences of debt, as it does circulating notes, to be countersigned by the comptroller, or to be made payable on demand, or at the place of business of the association. (Laws of 1838, 246, 249-251, §§ 3, 18, 21, 26; 4Hill, 445, 446, 450, 451, 454-456, 462, 463, 465; 1 Cow.,
513; 3 Wend., 94; 9 Paige, 470.) Since the act of 1840, they must, however, all, except perhaps obligations expressly given for the repayment of borrowed money, be made payable on demand and without interest. (3 Denio, 70; 3 Comst., 35; 10 Paige,
114.) Under the principles above stated, and the decisions referred to, such of the mortgage bonds in this case as were issued prior to the act of 1840 cannot be pronounced void, as contrary to public policy, merely because they were payable at a future day.
I think these bonds are not, by the law as established in this state, sealed obligations. The common law intended, by a seal, an impression upon wax, or wafer, or some other similar tenacious or adhesive substance, capable of being impressed. (4 Kent's Com.,
452; 5 John., 224.) It was expressly decided, in Coit v.Millikin (1 Denio, 376), and in Farmers' and Mechanics'Bank v. Haight (3 Hill, 494), that an impression upon paper alone is not a seal, except where it has been made so by statute. (2 Hill, 227.) The provisions in the Revised Statutes (1R.S., 404, § 74, 3d. ed.), and the act of April 7, 1848 (Laws of 1848, 305), in relation to seals, are legislative declarations that an impression upon paper alone is not a seal at common law. Independent of statutory enactments, the seals of private corporations and *Page 226 
individuals are similar in character, and both are alike distinguishable from the seals of courts and public officers. I am aware that this objection is strictly technical in its character, and especially so, as a distinct and durable impression can be made upon paper as well as upon wax or wafer, and, as in this case, the company manifestly intended to make the instruments in question bonds, by affixing to them its common seal; but it is our office to declare the law as we find it established.
The mortgage bonds were not issued in violation of the restraining law. They were neither issued for the purpose of being loaned, or of being put into circulation as money. (1R.S., 712, § 6, 3d ed.) The evidence, and the instruments on their face, show that the company did not intend that they should perform the office of a circulating medium, and it is apparent that they were not capable of performing that office. (9 Paige,
470; 4 Hill, 450, 452, 463.) They are not made in the similitude of bank notes; they are pay able in sterling money; and are in the form of bonds, and contain a provision making them convertible into stock; they were made to be negotiated in England, and are for the payment of large amounts, and at a distant day, and were intended to be payable in England; and the interest is payable there. These characteristics prevented the circulation of these bonds as money.
The mortgage bonds being valid, the coupons annexed to them must be valid also. The latter have no existence or vitality independent of the bonds; they together form but one agreement. The coupons are intended to be cut off when the interest is paid, and delivered to the obligor, to be retained by him as receipts for the interest paid. They are attached to the bonds for the double purpose of being used as receipts for interest paid, and as evidence to the purchaser of the bonds, of the non-payment of the interest represented by such of the coupons as remain attached to the bonds. (Clark v. City of Janesville, Dist.Court U.S. for *Page 227 Wisconsin, 4 American Law Reg., 597, per MILLER, District J., 1 Sandf. Ch. R., 313.)
It is also insisted, on the part of the receiver, that the four hundred and ninety-nine bonds secured by the million trust negotiated in England are void for usury. The documentary and oral evidence shows that the contract for the sale of these bonds was made and the money advanced on them paid in England; that the semi-annual interest to accrue thereon was to be paid in London, and the principal ultimately to be repaid there. The purchasers, at the time of the purchase, resided and still reside in England. These facts make the contract an English contract; and the question of usury, therefore, is to be determined by the English law. It is a general rule that the law of the place, where contracts purely personal are made, must govern, as to their construction and validity, unless they are to be performed in another state or country, and were made in reference to the laws of such state or country, in which case their construction or validity depends upon the laws of the place of performance. (6Paige, 630; Story on Confl. of Laws, § 242; 2 Kent's Com.,
457, 7th ed., note a; Parsons on Cont., §§ 95, 96; 1 Cow.,
108; 2 Burr., 1077; Story on Confl., §§ 653, 654; 13 Peters'U.S.R., 65; 4 Cow., 510, note; 17 John., 518.) If no place of performance is expressly stated or can be implied from the terms of the contract, the law of the place where it was made will govern. (Story on Confl. of Laws, § 282.) It is a settled principle, where no place of payment is mentioned in the contract, that its legal construction is, that the money is to be paid to the creditor where he resides, or wherever he may be found. (6 Paige, 630; 10 Wheat., 367; 2 Parsons on Cont.,
95, 99.) Where the contract for a loan of moneys is made in one country and payable in another, the parties may stipulate for the payment of interest according to the laws of either country. (2Parsons on Cont., 95, 96; 20 Martin's Law R., 1; 14 Verm.,
33; 6 *Page 228 Paige, 634; 13 Peters' 65; 1 Paige, 220; 7 id., 632; 22Barb., 127, 128, 129.)
The fact that the mortgage bonds were secured by the assignment, to the trustees, of mortgages on lands in this state, will not, in my judgment, make the contract of loan in this case a New-York contract. (Story's Confl. of Laws, § 287, a, 293;DeWolf v. Johnson, 10 Wheat., 367, 383; 13 Peters, 65, 78.) The case of Chapman v. Robinson (6 Paige, 630), which seems to lay down a different rule, is in many respects unlike the present case. In that case the contract was partly made in England and partly in this state, and the securities were actually executed in this state, and the money was payable generally. In this case, the contract was wholly made in England, the money was advanced in England and was to be repaid there, and the denomination of English money used in the contract stamps it as an English contract.
Although the contract for the sale of the four hundred and ninety-nine bonds is an English contract, it will be unnecessary for me, in consequence of the construction I have given to the act of the 6th of April, 1850, to discuss the question whether the contract is usurious under the act of 12th Anne, ch. 16, or is taken out of the operation of that act by the act of the 2dand 3d Victoria, ch. 37. The act of 1850 (Laws of 1850, 334, § 1) declares "that no corporation shall hereafter interpose the defence of usury in any action." The second section declares that the term corporation shall be construed to include all associations and joint-stock companies. The prohibition is, that no corporation shall, after the passage of the act, interpose the defence of usury in any action. This prohibition is not directed merely against pleading or proving the defence, but it is against interposing it; that is, either by plea or by proof, or by claiming the benefit of it at the trial or hearing. The statute was intended to embrace, in the prohibition, the setting up as a defence usurious agreements, made as well before as after the passage of the act. This intent is evident, *Page 229 
from the omission to insert in the act a saving clause in favor of existing rights and remedies of persons having a right to set up the defence of usury, as was done in the act of 17 and 18Victoria, ch. 90, repealing the English statutes of usury. The defence of usury is in the nature of a penalty or forfeiture, and may at any time be taken away by the legislature, in respect to previous as well as subsequent contracts, without trenching upon any vested right. A proposition that a party can have a vested right in enforcing a penalty or a forfeiture against which it is the office of a court of equity to relieve, is a legal solecism. Statutes of usury are highly penal in their character; and the defence of usury has always been regarded as an unconscientious defence; and has never received the favor of either courts of law or of equity. (6 Hill, 224, 226; 23 Wend., 80; 1 John Ch.R., 439; 5 id., 143; 3 Barb. Ch. R., 640; 7 Hill, 391; 2Comst., 131; 3 Paige, 528, 533, 534; 11 Wend., 330; 2Barb. Ch. R., 371, 373.)
It is a settled principle that the repeal of a statute, imposing a penalty, instantly takes away the penalty, although a prosecution for it is pending; and if the repeal takes place after conviction, it arrests the judgment. (Butler v. Palmer,
1 Hill, 330; 11 Pick., 350.) No penalty can be enforced after the repeal of the law imposing it, unless saved by express words in the repealing act. (5 Cranch, 181, 283; 6 id., 329.) The repealing statute "obliterates the statute repealed, as completely as if it had not been passed, and it must be considered as a law that never existed, except for the purpose of those actions which were commenced, prosecuted and concluded while it was an existing law." (Per Lord Ch. J. TINDAL, Key
v. Goodwin, 4 Moore Payne, 341, 351.) As soon as the statute imposing the penalty is repealed, the very foundation of the action to recover it is taken away, and the action must fall with the law. The act of 1850 is in substance a repeal of the statutes of usury, so far as relates to corporations. The language as well as *Page 230 
the spirit of the act applies to antecedent as well as subsequent usurious agreements. The prohibition applies not only to the corporation, but also to all who claim under or through it. Thus, as the corporation is inhibited from interposing the defence of usury, as against a usurious agreement, its creditors, who must claim through it in order to assail such agreement, are also inhibited. I conclude, therefore, that the act of 1850 has taken away from the receiver, as the representative of the corporation, and of its stockholders and creditors, the right to interpose the defence of usury to the four hundred and ninety-nine bonds.
The next question to be considered is, whether the two hundred and seventy bonds delivered to the two Philadelphia banks, to secure certificates of deposit given upon the loan of $250,000, made by those banks to the company, or to secure the payment of such loan, are void, because delivered to secure a usurious loan, and because such certificates were prohibited by the act of 14th May, 1840. [The learned judge here states the facts substantially as stated on pp. 28-32, ante, and then proceeds.] The provisions of the contract made it a Philadelphia contract, and the usury laws of that state must be applied to it. If, under the laws of that state, the contract was usurious, the two banks would nevertheless be entitled, under such laws, to recover the sum actually advanced, with six per cent interest, as the penalty in that state for usury is limited to the illegal excess of interest stipulated to be paid by the borrower. (Col. Act ofPenn., 2 March, 1723; Laws of Penn., by Brown, ed. of 1803, 191, 192; 7 Paige, 636, 637.) I do not, however, think that the loan was usurious by the laws of either Pennsylvania or New-York. Where a bank discounts a note payable at its place of business, and at the request of the borrower, it advances him the proceeds at some distant place, it may deduct therefrom the difference in exchange between the two places. (10 Paige, 113; 2 Hill, 460; 13 Peters, 65, 76, 77; 9 Peters, 378; 13 How. U.S.R., 152, 171, 172; 19 *Page 231 John., 496; 10 Wend., 116.) But if the loan did violate the usury laws of either New-York or Pennsylvania, the act of 1850 has taken from the company and its representative the right to interpose a defence founded on such violation.
If the agreement for the loan had provided that the two hundred and seventy bonds should be delivered to the two Philadelphia banks, to be held by them as security for the payment of the loan, instead of being held as security for the payment of the twelve time certificates of deposit, no doubt could have been entertained in respect to the right of the two banks, under the contract of loan, to hold the bonds as valid securities, with all the rights of purchasers for a valuable consideration, secured by the first half million trust need, and accompanying assignments, unaffected by the act of May 14, 1840, inasmuch as these bonds had been issued and pledged to the Palmers, and, therefore, had a legal existence prior to the 3d of June, 1840. But as the agreement declares that the company had directed their agents to deliver the bonds to the two banks, "to be held as collateral security for the payment of the certificates," the question arises whether the pledge of the bonds to the banks is not invalid, within the decision in Leavitt v. Palmer (3Comst., 19). My first impressions were very decided, that the pledge to the banks could not be sustained, if we adhered to that decision. Upon subsequent reflection, however, I have come to the conclusion, although with some hesitancy, that the case of the Philadelphia banks may be distinguished from that of Leavitt v.Palmer. Leavitt v. Palmer carried the doctrine of the strict interpretation of written instruments in opposition to the manifest intent of the parties, as far as the principles of law and equity will justify. In that case, the North American Trust and Banking Company, being under a contingent liability to the Palmers for their acceptance of the Davis bills, on the 30th of November, 1840, made forty-eight negotiable promissory notes, payable on time, and delivered them to the Palmers, on account of such *Page 232 
liability; and, at the same time, and as part of the same transaction, executed a trust deed, and assigned certain stocks and bonds and mortgages, for the purpose of securing the payment of these notes. The Court of Appeals decided, that as the notes were illegal and void, the trust deed and assignments, being a part of the same transaction, and given to secure the payment of the illegal notes, were also illegal and void. The trust deed and accompanying assignments were held invalid, because they were executed and delivered at the same time, and as a part of the same transaction, as the giving of the illegal notes. Being thus united in their creation and object, it was held not to be possible to separate the trust deed, c., from the fate of the notes, and that as the latter must fall, the former could not stand. This distinguishing feature of Leavitt v. Palmer, is not to be found in the case of the loan of the Philadelphia banks. Here the mortgage bonds in question were not executed at the time of the execution of the twelve time certificates of deposit, and did not with them form a part of one and the same transaction. These bonds had a legal existence, under the first half million trust deed, as valid securities in the hands of the Palmers, as pledgees of the same, prior to the loan by the banks to the company, and prior to the execution of the illegal certificates of deposit, and consequently their fate was not connected with the fate of the certificates. The voidness of the certificates could not avoid the bonds. They, while being independent valid securities in the hands of the Palmers, pledged to them for the payment of their debts, were delivered by them to the two banks, for the sole purpose of securing to them the payment of their loan to the company. It follows, from these facts, that if, in consequence of any illegality in the agreement between the banks and the company, the pledge of the bonds to the former was invalid, or if the purpose of their delivery has been in any way defeated, the bonds reverted to the Palmers, to be held by them under their original pledge. These *Page 233 
bonds could not, in the case supposed, revert to the company, as the interest of the Palmers therein had not been released to the company, and as the former had received no consideration from the latter to support a release of their interest.
If, then, as is insisted by the receiver, the pledge of the two hundred and seventy bonds to the two Philadelphia banks is invalid, the receiver has no interest in these bonds, except to the extent of any contingent surplus which may remain, after satisfying the entire indebtedness of the Palmers, for which the unsold bonds, including the two hundred and seventy, were pledged to them. As the evidence shows there will be no such surplus, the receiver has no such interest in these bonds as authorizes him to question the title of the two banks to them. The Palmers, who alone, in the case of the invalidity of the pledge to the two banks, can assert a claim to the two hundred and seventy bonds, having omitted to assert any claim thereto, I can see no objection to these banks retaining the bonds as a security for their loan, in accordance with the original intent of all the parties. The agreement in relation to the loan, consists of several distinct provisions. The provision as to the loan is separate and distinct from that in respect to the certificates. The latter were not received in payment of the money lent, but merely as security for its repayment. The two provisions can be separated; the one in relation to the certificates may be void for illegality, while the other, in relation to the loan, may be sustained as legal and valid. As, then, the contract of loan is valid, and as the bonds were delivered to the two bank by the Palmers, for the purpose of securing the repayment of the loan, and as this was the object of the company in directing their delivery, I am not able to see why we cannot give effect to the substance of the agreement between the two banks and the company, and to the intent of all the parties to the same; and why, notwithstanding the illegality of the certificates, we cannot adjudge that the two banks *Page 234 
have a right to hold the two hundred and seventy bonds as a security for the money lent by them to the company.
It was manifest, from the evidence, that the two Philadelphia banks made their loan upon the credit of the pledge of the two hundred and seventy bonds, as a security for its repayment, and that such was the agreement of both parties to the loan. This distinctly appears from two letters of Beers, one to the Palmers and the other to Murray, both of the date of the 1st of July, 1840, the day of the date of the written agreement for the loan. In Beers' letter to Murray, he states that the company had made a loan of $250,000 from the Philadelphia banks, upon a pledge of the mortgage bonds; and in his letter to the Palmers, he says that the loan had been made upon a pledge of three hundred bonds, as collateral to the certificates of the company. The order of the company, of the 1st of July, 1840, to the Palmers, to deliver to the agent of the two banks the two hundred and seventy mortgage bonds, was a part of the original contract of the loan; but it contained no reference to the certificates, and was not so connected with them as to be tainted by their illegality. There is no evidence that the directors and officers of the two banks had any knowledge of the illegality of these certificates, and, as they were residents of another state, the presumption is that they had no such knowledge. They could not, therefore, have been guilty of any wilful coöperation with the company in the issuing of these certificates. Inasmuch, then, as the two banks were entirely free from guilt in this transaction with the company; and as the contract of loan, being separate and distinct from the agreement to deliver the illegal certificates to secure its payment, was legal and valid; and as the order upon the Palmers to deliver the bonds, and their delivery by them to the two banks, had no necessary connection with the certificates; and as the loan was made upon the credit of the bonds; and as the intention of all the parties was that the mortgage bonds should be delivered to the two *Page 235 
banks, as their security for the repayment of the loan; and as such was the effect, substance and intent of the agreement between the banks and the company, I think that the bonds should be deemed to have been delivered as a direct security for the payment of the loan, instead of an ultimate security, for that purpose, through the medium of the illegal certificates. We may strike out the whole of the agreement which relates to the void certificates, as must be deemed to be done in consequence of the taint communicated to it by the illegal certificates, leaving nothing in the agreement but the contract of loan; and this contract, in connection with the order upon the Palmers for the delivery of the bonds, and their delivery in pursuance of the order, will entitle the two banks to hold the bonds as a security for their loan.
But if I am wrong in my conclusion as to the validity of the pledge of the two hundred and seventy bonds as a security for the loan of the two Philadelphia banks, these banks have, nevertheless, or rather those who now own their claims have, upon the principle settled in the Indiana case, a valid and meritorious debt against the company, to the extent of the sum advanced to the latter, with interest at the rate of six per cent, and are entitled to have such debt allowed as a claim against the company, to be paid ratably with the other creditors out of its assets.
It is claimed, on the part of the receiver, that the two Philadelphia banks have no valid debt against the company, because the loan on which it is founded is usurious; and because it was made upon an illegal agreement that the company issue and deliver to them, as a security for the payment of the loan, time certificates of deposit, prohibited by the act of 1840. The answer to this proposition is: First. That the loan was not in fact usurious; and if usurious, that the company and its receiver are prohibited by statute from interposing the usury as a defence; and Second. That the illegality of the time certificates is created by a statutory prohibition, which is malumprohibitum merely, and by the *Page 236 
imposition of a penalty, the former of which is directed against the company only, and the latter is imposed upon its officers and members alone; being the precise case presented to this court in the matter of the Indiana claim. (Tracy v. Talmage, 4Kern., 162.) In that case, the state stocks of Indiana had been sold to the North American Trust and Banking Company, under an agreement to receive in payment the time certificates of deposit of the company, conceded for the purposes of that case to be prohibited by law; and it was decided that the parties were neither in pari delicto, nor participes criminis, and that the State of Indiana was entitled to recover against the company, not the price agreed to be paid for the stocks upon the express contract of sale, which was void, but their actual value, upon an implied contract to pay, for the stocks transferred, so much as they were reasonably worth. In that case, the English and American authorities on the subject were carefully reviewed by Judges SELDEN and COMSTOCK, and the principle deduced by them from such authorities, and adopted by this court was the following, viz.: That in all cases of illegal contracts which aremalum prohibitum merely, and where the prohibition and penalties are directed against one of the parties to the contract only, and the other party has advanced money or property upon the contract, relief will be granted to the latter, although he has participated in the transaction, if he is not in pari delicto
with the party whom the statute has marked as the criminal by imposing upon him all the penalties. In all such cases, where there is no parity of guilt between the parties, the more innocent will be entitled to a remedy against the more guilty, for money or property advanced to the latter upon the illegal contract. Where the contract involves moral turpitude, the parties are in pari delicto, and neither will be entitled to any relief as against the other.
The decision in the Indiana case meets with my unqualified approval. It stands upon the impregnable foundation of *Page 237 
law, justice and equity. The principle of discrimination between the parties to an illegal transaction, which is merely malumprohibitum, and of examination into their relative guilt, which that decision embodies, will be eminently benign in its application in the daily administration of justice. The renunciation of this principle will leave the party whom the statute and morality alike mark as the criminal, to secure with impunity the fruits of an illegal transaction, and to appropriate to himself, without compensation, the property of the comparatively innocent parties thereto. "Such a principle," as is truly said by Judge SELDEN, "would afford the strongest possible inducement for the banks to transgress the law. All that they could get into their hands, by persuading other to take their unauthorized paper, would be theirs."
It is also insisted by the receiver, that the Palmers have no valid debt against the company, because the debt claimed by them arises, in part, out of an illegal sale of South Carolina state stocks to the company, and out of payments made to take up Murray debentures, time certificates of deposit, and time bills of exchange, all which were illegal; and because they coöperated with the company in conducting all the illegal transactions connected with these securities. The evidence, I think, shows that the South Carolina state stocks, purchased by Murray for the company, and pledged to Sanderson Co., for a loan of money made by them and Samuel Mills to the company, belonged to L.M. Simon, and were sold by the Palmers to the company, as his agents. The Palmers advanced the purchase money for these stocks, being £ 34,800, on a draft of Murray on them, and charged it in their general account as of the date of 13th August, 1840. The proceeds of the loan obtained by Murray, on the pledge of these stocks, and of £ 40,000 of Indiana stocks, being £ 52,187, were paid by Murray to the Palmers, and credited by them to the company. The South Carolina bonds, after the purchase by Murray, and after the loan *Page 238 
was negotiated by him, were, by virtue of an order from Murray, delivered by the Palmers to Sanderson Co., and at the time of such delivery it was understood between Murray and the Palmers that they were to receive the proceeds of the loan. The South Carolina stocks were subsequently sold, and the proceeds applied towards the liquidation of this loan.
I am inclined to believe that the condition of the Palmers, in respect to their relation to the alleged illegal purchase by the company of the South Carolina stocks, would have been substantially the same whether they sold the stocks as principals, or as agents of Simon. For if the sale was illegal, they, although making the sale as agents, would be parties to the illegality, in like manner as if they had made the sale as principals. It is for this reason that if an agent is connected with an illegal transaction of his principal, and advances money for him in furtherance of such transaction, he cannot recover the money advanced from his principal. (Paley on Agency, 116,Dunlap's ed., 102; Story on Agency, §§ 346, 347.)
The purchase of the South Carolina stocks by Murray, as agent of the company, for the purpose of pledging them for a loan of money, was, under the decision in Talmage v. Pell (3 Seld.,
328, 348), ultra vires, being unauthorized by the general banking law, and the act of the 14th of May, 1840, amendatory of the same. The purchase of state stocks for the purpose of selling at a profit, or as a means of raising money, except when received as security for a loan, or a debt due to the association, or when taken in payment of such loan or debt (3 Seld., 343, 348), is not expressly prohibited; but it is insisted that, being neither a power expressly granted, nor incidental to the business of banking, or, in other words, not necessary to the accomplishment of any of the purposes of the creation of a banking association, its exercise is ultra vires, an excess of corporate authority, and is therefore impliedly prohibited. (30 Eng. L. Eq *Page 239 R., 127, 129, 131, 137.) The powers of corporations are undoubtedly limited to the purposes of their creation. This proposition rests upon the soundest principles of reason and public policy. It is the only protection of the public against corporate aggression. (30 Eng. L Eq. R., 137; 7 id., 508; 16 id., 180.) But there is, in my judgment, a distinction between the acts of a corporation, innocent in themselves, which are illegal because expressly prohibited by some positive law, and similar acts which are void merely because they are beyond the corporate powers of the corporation. Illegality cannot, with grammatical propriety, be applied to the latter. Such acts are void, because unauthorized. They are not strictly illegal, because not expressly prohibited by law. An instrument intended as a will, which is attested by only one witness, is not illegal; it is merely inoperative and void as a will; but a usurious loan of money is illegal, because expressly prohibited by law and punishable as a misdemeanor. Moral guilt never can be imputed to a party to a contract with a corporation, involving no moral turpitude, which is merely ultra vires as to such corporation.Par delictum and particeps criminis are not predicable of him in respect to his relation to such a contract. This is emphatically so, where he was ignorant of the excess of authority of the corporation in making the contract. It is conceded that such a contract is void, and cannot be enforced against the corporation. But it is not a legitimate result from this concession that the corporation, which has by means of an unauthorized exercise of power, obtained the possession of the property or money of the person dealing with it, can withhold it from him without compensation. The contract in all such cases will be regarded as void, and the party who delivered the property or advanced the money to such corporation will be entitled to his legal remedy, not founded upon the contract, but in repudiation of it, to recover the property or the money from the corporation, upon the principle that it had acquired no right or title to *Page 240 
either under the contract. These propositions accord with the views expressed by Judge COMSTOCK, in the Indiana case. In his opinion in that case, he says: "The maxim, in pari delictopotior est conditio defendentis, has never been applied to the case of a person contracting with a corporation, simply beyond the powers of the latter." And he further says: "It is admitted that the contract of a corporation, which it has no legal capacity to make, cannot in its terms be enforced. But it does not follow that the alleged transgressor may appropriate, without compensation, the money, the goods or the services of the person with whom it deals."
The decisions in The East Anglian Railway Co. v. EasternCounties R.R. (7 Eng. L. Eq. R., 508); McGregor v.Manager of Deal Dover R.R. Co. (16 id., 180); The Mayor ofNorfolk v. The Norfolk R.R. Co. (30 id., 120), do not conflict with these views. In all these cases the action was founded upon and was in affirmance of the unauthorized contract. And in the last cited case, the rule that no action can be sustained upon the contract of a corporation, which it had no authority to make, is applied only to cases where the excess of authority of the corporation was known to both parties, or at least to the party suing upon the contract, at the time of the making of the same. (30 Eng. L. Eq. R., 128, per ERLE, J.;id., 143, 144, per Lord CAMPBELL, C.J.; Royal British Bank
v. Turquand, 5 Ellis Black., 260.) In the case of TheRoyal British Bank v. Turquand, Lord CAMPBELL says: "A mere excess of authority by the directors, we think, of itself would not amount to a defence;" and he also says, if no illegality is shown, as against the party with whom the directors contract under seal of the company, excess of authority is a matter only between the directors and shareholders. I am aware that in the cases in 7 Eng. L. Eq. R., 508, and in 16 id., 180, it was held that the acts incorporating the railway companies which were parties in those suits were public acts, and that parties dealing with *Page 241 
them were presumed to have full knowledge of the extent of their corporate powers. It is evident, however, that such a presumption could not be justified as respects citizens of a foreign country. Upon the principles above stated, the purchase of the South Carolina stocks by the company, for the purpose of pledging the same for a loan of money, was a purchase which involved no moral turpitude, and was simply ultra vires; and the Palmers, if they were the vendors of the stocks, are entitled to be allowed their value; or if they sold the stock as agents merely of Simon, they can claim an allowance for the moneys loaned or advanced by them to the Company to enable it to pay Simon for the stock.
If the purchase of the stocks, for the purpose of pledging the same for a loan of money, is to be regarded as a purchase for an illegal purpose, questions might be raised, whether it was made a part of the contract of sale that the stocks should be so pledged, and whether the Palmers did anything in furtherance of such purpose. But the consideration of these questions, if they legitimately arise, is not important, as, if the charge of £ 34,800, in the general account of the Palmers, for the advance for the company of the purchase money of these stocks, is rejected, an equivalent sum of the credit of £ 52,187, the proceeds of the loan obtained on a pledge of these and of the Indiana stocks, must be stricken out of the same account; especially as the South Carolina stocks were subsequently sold, and the proceeds of such sale applied in liquidation of the loan. I may add that the evidence authorizes the inference that, at the time of the purchase of the South Carolina stocks (August 12, 1840), the Palmers had no knowledge of the passage of the act of 1840, limiting the deposit of state stocks with the comptroller to the stocks of this state (Laws of 1840, 306, § 1); and that they, at that time, had no knowledge that the company had no power to purchase state stocks for the purpose of selling for profit, or of pledging the same, as a means of raising money. The decision in Talmage v. Pell, establishing the non-existence *Page 242 
of this power, was not made until the year 1852. If this is a conclusion of fact, warranted by the evidence, the Palmers cannot be charged with a wilful complicity with the company in its illegal traffic in state stocks.
Previous to the passage of the act of 1840, the company had an undoubted right to draw bills of exchange, either foreign or domestic, and payable either at sight or on time. This power is implied in the express power to buy and sell bills of exchange; it is at least incidental to the exercise of that power. This was decided in Safford v. Wyckoff (4 Hill, 462), and the existence of the power has, since the decision of that case, been expressly recognized by the Court of Appeals, in Leavitt v. DeLauny (4 Comst., 364). A bill of exchange may be drawn on funds in the hands of the drawee, or on the strength of the credit of the drawer, and it may be drawn on time in anticipation of funds at the place where the bill is payable. (3 Edw. Ch.R., 146; 2 Sandf. Ch. R., 156; 15 John., 44.) The drawing, and buying and selling bills of exchange, is within the legitimate business of banking. It is one of the ordinary attributes of a bank of discount. (Beawes' Lex Mercatoria, 384,ed. of 1792.) The general power to draw, or buy and sell bills of exchange, implies the right to draw and buy and sell bills, payable either at sight or on time. The act of 1840 restricts the power to bills payable on demand, and the restraining act prohibits the issuing of bills for the purpose of loaning them and putting them in circulation as money, unless payable on demand, and countersigned by the comptroller. (Act of 1838, 246; 1 R.S., 712.)
The company, under the power to receive deposits, had the power to receive them under an agreement to repay them on time. This power is not prohibited by the general banking law. It does not violate any sound principle of banking, or any principle of public policy. It is a convenient and useful power to the banks; it admonishes the managers when to provide means for repayment. It is a *Page 243 
power which has always been exercised without objection from any quarter. If a bank has a right to receive deposits, to be repaid at a future day, it certainly has a right to issue a certificate as evidence of the actual deposit, and of the time it is to be paid. The act of 1840 limits the power to issue these certificates to such as are payable on demand; although it does not prohibit the receiving of deposits payable on time. The right of banking associations to issue certificates on time, prior to 1840, was plainly conceded by Judge BRONSON, in Leavitt v.Palmer (3 Comst., 33-35). The authority of the company to issue these certificates, either foreign or domestic, may be sustained under the general power of the company to borrow money. Under this general power a bank may borrow money and give any security for repayment not prohibited by law. (Beawes' LexMercatoria, 384, 398.)
The foreign bills of exchange, and foreign certificates of deposit, payable on time, issued prior to 1840 and taken up by the Palmers, were not, for the reasons before stated, violations of the restraining law. The moneys, therefore, advanced by the Palmers, at the request of the company, in paying or taking up these securities, constituted a valid debt against the company.
All the foreign time bills of exchange, except eight, were issued by the company prior to the 3d June, 1840. Seven of these were drawn upon the Palmers, by the company, on the 31st July, 1840, and one on the tenth day of August of the same year. These bills were drawn for the purpose of raising money to meet the liabilities of the company. The eight bills were paid by the Palmers at maturity. These bills of exchange, being payable on time, were prohibited by the act of 1840, and were therefore void. The officers of the company are presumed to have issued them with full knowledge that they were prohibited; but the Palmers, being residents of a foreign country, must be presumed, in absence of all evidence to the contrary, to have *Page 244 
had no notice of the act of 1840, and, therefore, no knowledge of the invalidity of these bills of exchange, and to have accepted and paid them in good faith. Here, not only is the prohibition directed against, and the penalty imposed upon the company alone, but the whole criminality of the transaction is imputable to the company. The Palmers, having no notice of the act of 1840, are entirely innocent of any wilful coöperation in its violation. Their claim, therefore, to recover the moneys advanced to the company in payment of the eight bills of exchange, issued after the 3d June, 1840, is manifestly just and legal. Judge SELDEN and the general term of the seventh district, came to a like conclusion, under similar circumstances, in the case of The Bankof Chilicothe v. Dodge (8 Barb., 235, 237.)
The same remarks will apply to all the Murray debentures, issued after the 3d June, 1840, which were endorsed or guaranteed by the Palmers.
All the foreign certificates of deposit, taken up by the Palmers at the request of the company, were issued prior to the 3d June, 1840.
The Davis bills of exchange were drawn prior to June, 1840, and the Palmers, under the letter of credit of the company, accepted them, or agreed to accept them, before notice that they were drawn to pay for the stock of the company purchased by Davis for its benefit.
If any of the bills of exchange or certificates of deposit paid by the Palmers on the request of the company were founded upon or arose out of illegal stock or other transactions, the claim to recover the moneys advanced is, nevertheless, legal and valid, because it is not founded upon such transactions, but arose out of subsequent and totally distinct contracts, and is supported altogether by new considerations. The test, whether a demand connected with an illegal transaction is capable of being enforced at law, is whether the plaintiff requires any aid from the illegal transaction in establishing his case. (Chit. onCon., 657, and cases cited in *Page 245 notes, Springfield ed. of 1848; Simpson v. Bloss, 7Taunt., 246.) The leading case on this subject is that ofFaikney v. Reynous (4 Burr., 2069.) In that case the plaintiff and one R. were jointly concerned in stockjobbing contracts prohibited by statute; and the plaintiff, contrary to the statute, gave to divers persons money for compounding differences, for not delivering stock, c.; and the defendants gave the plaintiff a bond, as a security for the repayment by R. to him of one-half of his advances. The action was upon this bond, and the court of King's Bench decided that the plaintiff was entitled to recover. Lord MANSFIELD, in that case, held that as the act prohibited was not malum in se, and the plaintiff had paid money for R. and upon his account, he had a right to recover. He said, that if money be lent in order to pay a play-debt, or to pay off an usurious contract, and a bond be given to secure the repayment of the money lent, the bond is valid. This case establishes the principle, that if a person lends money to a party to an illegal contract, for the express purpose of paying a debt due by him upon such contract, the lender can recover from him the money lent; and the case goes even so far as to authorize a recovery, although the lender himself be one of the original parties to the illegal contract. The decision in this case was followed by the decision inPetrie v. Hannay (3 D. E., 418, 423), where it was held that if one of the parties to an illegal contract pay money, due on such contract by another party to the same, and upon his direction, the law gives the former the right to recover it from the latter. The principle of these cases was reaffirmed inTenant v. Elliot (1 Bos. Pul., 3); Farmer v. Russell
(1 Bos. Pul., 296); Pemberton v. Same (13 Ves., 290);Simpson v. Bloss (7 Taunt., 246); Armstrong v. Toler
(11 Wheat., 258.) It was doubted in Aubert v. Maze (2 Bos. Pul., 371); exparte Mather (3 Ves., 273); exparteDaniels (14 Ves., 191.) In Simpson v. Bloss (supra), GIBBS, C.J., says, "that the court held in Faikney v. Renous,
and in Petrie v. *Page 246 Hannay, that he who borrowed money to pay a debt which he owed upon an illegal transaction, not malum in se, might be sued for the repayment of the loan, although the lender knew to what purpose the money was to be applied; because the lender's right of action is founded altogether upon the contract of loan between him and the borrower, and derives no aid from the illegal transaction in which the borrower had been originally concerned, nor is it affected by it. The ground of the decision was, that the plaintiffs required no aid from the illegal transaction to establish their case." Ch. J. MARSHALL, in Armstrong v. Toler
(supra), in reviewing the case of Faikney v. Renous, says: "this is a strong case to show that a subsequent contract, not stipulating a prohibited act, although for money advanced in satisfaction of an unlawful transaction, may be sustained in a court of justice." In such cases, the money is recoverable, although knowingly advanced in a matter collateral to, and remotely connected with, the illegal transaction, because it is one degree removed from such transaction, and is in itself perfectly legal in its consideration and formation as an independent contract. (Story on Agency, § 347; 2 Poth. onObli., 16, ed. of 1806, by Evans, App. No. 1.) Upon the principle of these authorities, all the advances made by the Palmers, upon the request of the company, in paying the time bills of exchange, the time certificates of deposit, the Murray debentures, the Davis bills, and any other of the debts of the company, are recoverable from the company, although such securities and debts grew out of and were founded upon illegal transactions. The money so advanced is recoverable, because the right of recovery is founded wholly upon a contract of loan, which is one degree removed from the illegal transaction, and is itself legal, in its consideration and formation as an independent contract, and in its establishment requires no aid from such transactions. I conclude, therefore, that the moneys advanced by the Palmers for the *Page 247 
company, and charged in their general account, constitute a valid debt against the company.